IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| CRUISE LINES INTERNATIONAL ASSOCIATION, INC.; HONOLULU SHIP SUPPLY CO.; KAUA'I KILOHANA PARTNERS; and ALOHA ANUENUE TOURS LLC, | CIVIL NO.  25-00367 KJM |
| Plaintiffs, | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| GARY S. SUGANUMA, in his capacity as Director of Taxation for the State of Hawai'i; HAWAI'I DEPARTMENT OF TAXATION; CHELSIE SAKAI, in her capacity as County Finance Director of the County of Kaua'i; COUNTY OF KAUA'I; ANDREW T. KAWANO, in his capacity as Director of the Department of Budget and Fiscal Services for the City and County of Honolulu; CITY AND COUNTY OF HONOLULU; MARCY MARTIN, in her capacity as Director of Finance for the County of Maui; COUNTY OF MAUI; DIANE NAKAGAWA, in her capacity as Director of Finance for the County of Hawai'i; and COUNTY OF HAWAI'I, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND .....................................................................................................2

    A.  Act 96's New Registration Requirements, Charges, and Compelled Speech Obligations for Cruise-Ship Operators ..................................................2

    B.  Act 96's Severe and Disproportionate Impact on Cruise Ships ......................5

LEGAL STANDARD ..............................................................................................7

ARGUMENT ...........................................................................................................7

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ....................7

    A.  Act 96 Violates the Tonnage Clause ..............................................................7

    B.  Act 96 Also Conflicts with, and Is Thus Preempted by, the Rivers and Harbors Act ..................................................................................................................11

    C.  Act 96 Impermissibly Compels Speech ........................................................12

    D.  Plaintiffs' Claims Do Not Implicate the Tax Injunction Act ........................14

        1.   The Tax Injunction Act Does Not Apply to the Hawaiʻi-Based Plaintiffs' Claims...........................................................................................................14

        2.   The Tax Injunction Act Also Does Not Bar Plaintiff CLIA's Challenges to the Surcharges ..............................................................................................16

        3.   The Tax Injunction Act Does Not Apply to CLIA's Challenge to Act 96's Registration Fees .......................................................................................20

        4.   The Tax Injunction Act Does Not Apply to CLIA's First Amendment Claims...........................................................................................................21

II.    PLAINTIFFS FACE IRREPARABLE HARM...............................................22

III.   THE PUBLIC INTEREST AND BALANCE OF EQUITIES ALSO FAVOR PRELIMINARY INJUNCTIVE RELIEF ...............................................................25

CONCLUSION ......................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Air Polynesia, Inc. v. Freitas,*
  742 F.2d 546 (9th Cir. 1984) ....................................................................19, 20

*American Beverage Ass'n v. City & Cnty. of San Francisco,*
  916 F.3d 749 (9th Cir. 2019) (en banc) ........................................................1, 13

*Baird v. Bonta,*
  81 F.4th 1036 (9th Cir. 2023) ...............................................................7, 22, 25

*Bidart Bros. v. Cal. Apple Comm'n,*
  73 F.3d 925 (9th Cir. 1996) .........................................................................20, 21

*Cal. Chamber of Com. v. Bonta,*
  No. 2:19-cv-2019, 2025 WL 1284779 (E.D. Cal. May 2, 2025).........................13

*Capitol Industries-EMI, Inc. v. Bennett,*
  681 F.2d 1107 (9th Cir. 1982) ............................................................................15

*Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n,*
  296 U.S. 261 (1935)........................................................................................7, 8

*Diamond Alt. Energy, LLC v. EPA,*
  145 S. Ct. 2121 (2025)........................................................................................15

*Direct Marketing Ass'n v. Brohl,*
  575 U.S. 1 (2015)........................................................................................21, 22

*E. Bay Sanctuary Covenant v. Biden,*
  993 F.3d 640 (9th Cir. 2021) .............................................................................23

*Ga. R.R. & Banking Co. v. Redwine,*
  342 U.S. 299 (1952)............................................................................................19

*Hyatt v. Yee,*
  871 F.3d 1067 (9th Cir. 2017) ......................................................................17, 19

*Nat'l Ass'n of Wheat Growers v. Bonta,*
  85 F.4th 1263 (9th Cir. 2023) ......................................................................13, 24

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
  585 U.S. 755 (2018) ..................................................................13, 24

*Polar Tankers, Inc. v. City of Valdez,*
  557 U.S. 1 (2009) ..............................................................1, 8, 9, 10

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
  487 U.S. 781 (1988) ..........................................................................12

*Rodriguez v. Robbins,*
  715 F.3d 1127 (9th Cir. 2013) .........................................................25

*S.S. Co. v. Portwardens,*
  73 U.S. (6 Wall.) 31 (1867) ...............................................................8

*Washington v. Trump,*
  145 F.4th 1013 (9th Cir. 2025) ........................................................14

**Constitutional Provisions, Statutes, & Other Authorities**

U.S. Const. art. I, § 10, cl. 3 .................................................................7

28 U.S.C. § 1341 .....................................................................*passim*

33 U.S.C. § 5 .........................................................................................11

33 U.S.C. § 5(b) ..........................................................................1, 11, 12

33 U.S.C. § 5(b)(1) .......................................................................11,12

33 U.S.C. § 5(b)(2)..............................................................................11

33 U.S.C. § 5(b)(2)(A)..........................................................................12

33 U.S.C. § 5(b)(3)........................................................................11, 12

33 U.S.C. § 2236 ..........................................................................11, 12

33 C.F.R. § 329.4 ...............................................................................12

HRS § 231-39(b) .................................................................................17

HRS § 232-14.5....................................................................................18

HRS § 232-16.............................................................................16, 17

HRS § 237D-2 ...................................................................................................21

HRS § 237D-2.5 ...................................................................................................3

HRS § 237D-4(a) ........................................................................................8, 11, 21

HRS § 237D-4(a)(2) ...............................................................................................4

HRS § 237D-4(b) ...................................................................................................5

HRS §§ 237D-4(b) ...............................................................................................13

HRS § 237D-4(c) ............................................................................................5, 13

HRS § 237D-6 .......................................................................................................4

HRS § 237D-7 .......................................................................................................4

HRS § 237D-9 .....................................................................................................17

HRS § 237D-9(a) .................................................................................................17

HRS § 632-1(a) ...................................................................................................15

HAR § 18-237D-1-03(c)(3) .................................................................................10

HAR § 19-44-20 ....................................................................................................9

Haw. Cnty. Code § 2-259 .....................................................................................3

Haw. Cnty. Code § 2-261(b) .................................................................................4

Haw. Cnty. Code § 2-261(c) .................................................................................4

Haw. Cnty. Code § 2-262 ......................................................................................4

Kaua'i Cnty. Code § 5-4.1 ....................................................................................3

Kaua'i Cnty. Code § 5-4.6(a) ................................................................................4

Kaua'i Cnty. Code § 5-4.7 ....................................................................................4

Kaua'i Cnty. Code § 5-4.19 .................................................................................18

Maui Cnty. Code § 3.47.010 .................................................................................3

Maui Cnty. Code § 3.47.060 ..................................................................4

Maui Cnty. Code § 3.47.070 ..................................................................4

Rev. Ord. Hon. § 8A-1.1 ........................................................................3

Rev. Ord. Hon. § 8A-1.6 ........................................................................4

Rev. Ord. Hon. § 8A-1.7 ........................................................................4

Rev. Ord. Hon. § 8A-1.14 ....................................................................18

Erik M. Jensen, *Quirky Constitutional Provisions Matter: The
    Tonnage Clause* Polar Tankers, *and State Taxation of Commerce*,
    18 Geo. Mason L. Rev. 669 (2011) .................................................10

Cnty. of Haw., Dep't of Fin., *Transient Accommodations Tax Refund
    Request Voucher* (Oct. 2024), https://tinyurl.com/5ymkst58 ...........18

DBEDT, *2023 Annual Visitor Research Report*,
    https://perma.cc/CZP5-C2K4 ..........................................................5

Off. of the Governor, *Historic Green Fee Launched to Combat
    Climate Change in Hawaiʻi* (June 2, 2025), https://perma.cc/4QJR-
    7LGR ................................................................................................9

*Hearing on S.B. 1396 Before the H. Comm. on Fin.*, 2025 Leg., 33d
    Sess. (Haw. 2025), https://perma.cc/9TW8-KFJV ...........................24

*National Judicial Caseload Profile*, Hawaii (Mar. 2025),
    https://perma.cc/HHN3-QNHC ........................................................17

## INTRODUCTION

This case involves an unconstitutional new Hawaiʻi law that, without judicial intervention, will impose hundreds of millions of dollars in fees on cruise ships and their passengers over the next decade.  Applicable to cruises in January 2026 and beyond, Act 96 (2025) conditions a cruise ship's access to Hawaiʻi ports on massive new payments that the State will use for various "green" initiatives.  No other State imposes comparable fees—and for good reason:  It has been a fundamental principle since the Founding that the navigable waters of the United States are a common resource, not one to be commandeered by individual States for their own parochial revenue-raising interests.  In keeping with that principle, both the Tonnage Clause of the U.S. Constitution and the federal Rivers and Harbors Appropriation Act of 1884 (Rivers and Harbors Act) prohibit States from imposing "charge[s] for the privilege of entering, trading in, or lying in a port" unless the revenue raised is used specifically for maritime services. *Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 8 (2009) (citation omitted) (applying Tonnage Clause); *see* 33 U.S.C. § 5(b).  Act 96 lacks any such limitation and is therefore invalid.

Making matters worse, Act 96 also compels cruise-ship operators to engage in speech supporting the new system of required payments.  Under established First Amendment principles, however, States may compel speech by private businesses only when doing so serves a "substantial governmental interest."  *American*

1

*Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 755 (9th Cir. 2019) (en banc) (citation omitted).  Because Hawaiʻi has no cognizable interest in facilitating the collection of unconstitutional fees, the compelled speech requirements of Act 96 are unconstitutional, too.

Given Act 96's blatant constitutional infirmities, this Court should enter a preliminary injunction barring enforcement of its cruise-ship-related provisions during the pendency of this suit.  Doing so is particularly urgent because potential cruise-ship passengers typically make travel decisions well in advance.  Act 96's impending surcharges for cruises that dock in Hawaiʻi thus will begin to skew the market even before they take effect, causing families who otherwise would have purchased tickets to cruise in Hawaiʻi in 2026 to make vacation plans elsewhere. The result will be substantial lost business not only for cruise-ship operators but also for the many Hawaiʻi businesses and workers whose livelihoods depend on the cruise industry.  No eventual final judgment declaring Act 96 invalid could undo that harm once it occurs.  Instead, the only way to protect against Act 96's plainly unconstitutional effects is to enjoin its operation immediately.

## BACKGROUND

### A.     Act 96's New Registration Requirements, Charges, and Compelled Speech Obligations for Cruise-Ship Operators

Enacted in May 2025, Act 96 establishes extensive new requirements and charges for cruise ships that visit Hawaiʻi ports on or after January 1, 2026.

2

The law's primary provision is a new 11% surcharge on cruise-ship fares. Specifically, Act 96 amends Chapter 237D of the Hawai'i Revised Statutes to add a surcharge of 11% "on all gross rental proceeds derived from cruise fares prorated by the percentage of days docked at any port in the State in comparison to the total number of days of the voyage."  Act 96 § 5.1.[1]  That amendment also triggers additional county-level surcharges in Kaua'i, Maui, Hawai'i, and Honolulu (collectively, the "Counties"), which each impose a 3% surcharge on "gross rental proceeds" from properties within their jurisdiction that are covered by Chapter 237D.  Haw. Rev. Stat. (HRS) § 237D-2.5; *see* Kaua'i Cnty. Code § 5-4.1; Maui Cnty. Code § 3.47.010; Haw. Cnty. Code § 2-259; Rev. Ord. Hon. § 8A-1.1. Cumulatively, therefore, Act 96 authorizes surcharges of 14% on the prorated portion of cruise fares for voyages docking in Hawai'i ports.  Responsibility for paying those surcharges rests on the "operator[s] . . . of cruise ship[s]," Act 96 § 5.1, though Hawai'i has indicated that it expects "99%" of the surcharges to be passed along to passengers, Compl. ¶ 31 (quoting a state official).

In addition to the fare-based surcharges, Act 96 also imposes new registration and registration-fee requirements on cruise-ship operators.  As "a condition precedent to engaging or continuing in the business of furnishing transient

---

[1]    The full text of Act 96 (2025) is available at https://www.capitol.hawaii.gov/sessions/session2025/bills/GM1196_.PDF.

accommodations," all operators of property subject to Chapter 237D must "register with the [Director of the Hawaiʻi Department of Taxation] the name and address of each [covered] place of business" and "make a one-time payment" of "$15 for each registration for transient accommodations consisting of six or more units."  HRS § 237D-4(a)(2).  As of January 1, 2026, therefore, a cruise-ship operator will be required to register each of its cruise ships with the Director and pay the required registration fees before its ships can dock in the State.

Act 96 also establishes ongoing reporting requirements.  Once the law takes effect, cruise-ship operators will be required to make monthly reports to the Department of Taxation about prorated cruise fares received over the past month, as well as payments of the related surcharges.  *See* HRS §§ 237D-6, 237D-7.  Each of the Counties requires corresponding monthly payments with respect to their 3% surcharges.[2]  And the State and each of the Counties also require year-end reporting and payment of any outstanding surcharges.[3]  Under Act 96, therefore, a single cruise-ship operator will be required to make as many as 65 separate payments for a single year.  Unlike at the federal level, moreover, those obligations are not consolidated for multiple operators with common corporate ownership.  Members

---

[2] *See* Haw. Cnty. Code §§ 2-261(b)–(c); Kauaʻi Cnty. Code § 5-4.6(a); Maui Cnty. Code § 3.47.060; Rev. Ord. Hon. § 8A-1.6.
[3] HRS § 237D-7; Haw. Cnty. Code § 2-262; Kauaʻi Cnty. Code § 5-4.7; Maui Cnty. Code § 3.47.070; Rev. Ord. Hon. § 8A-1.7.

of Plaintiff Cruise Lines International Association, Inc. (CLIA) that have multiple subsidiaries could thus be required to make hundreds of separate payments as a condition of visiting Hawai'i ports in 2026.  *See* Oates Decl. ¶ 37; Mota Decl. ¶¶ 31–32.

Finally, Act 96 also compels cruise-ship operators to engage in speech.  It does so in two separate ways.  *First*, once Act 96 takes effect, cruise-ship operators will be required to "conspicuously display[]" their registration certificates (or notices about where those certificates may be inspected) on each of their ships.  HRS § 237D-4(b).  *Second*, they also will be required to include "[t]he registration identification number or an electronic link to the registration number" in "[a]ny advertisement, including an online advertisement," for passage aboard a cruise ship that will dock in any Hawai'i port.  HRS § 237D-4(c).

## B.    Act 96's Severe and Disproportionate Impact on Cruise Ships

By substantially increasing the price for cruise-ship voyages that dock in Hawai'i, Act 96 will harm not only cruise-ship operators but also the thousands of Hawai'i employees and businesses who depend on the cruise industry for their livelihoods.  Hawai'i's Department of Business, Economic Development and Tourism (DBEDT) estimated that in 2023 alone, nearly 300,000 unique visitors came to Hawai'i in connection with cruise travel.  DBEDT, *2023 Annual Visitor Research Report* 16, https://perma.cc/CZP5-C2K4.  Those visitors spent more than

5

$600 million in the State, in addition to their spending on the cruises themselves. *Id.*

Act 96 will reduce that travel and related spending materially. For many cruise trips that dock in Hawaiʻi, Act 96's new surcharges will translate to price hikes of hundreds of dollars per family. On one itinerary currently offered by a CLIA member, for example, Act 96 could result in more than $380 in new fees for a family of four. *See* Oates Decl. ¶ 8(c). While some families may be willing to pay those higher prices, others will not. As a result, Act 96 will cause many families to forego trips to Hawaiʻi in favor of other destinations. Other families will choose to shorten their trips to Hawaiʻi or to stay in hotels rather than visiting via a cruise ship.

Magnifying those effects, Act 96 imposes burdens on cruise-ship operators that are significantly higher than the burdens imposed on land-based accommodations. Under Act 96, the 14% cumulative surcharge will be calculated based on "the total amount paid by a [passenger] for a cruise ship cabin on a cruise ship, inclusive of any mandatory fees imposed . . . for the use of shipboard services, facilities, meals, and onboard entertainment." Act 96 § 4.1. Land-based businesses subject to Chapter 237D, in contrast, pay charges based only on the price of accommodations, with the costs of meals, beverages, and certain other goods and services expressly excluded. *See* Haw. Admin. R. (HAR) § 18-237D-1-03(c).

6

## LEGAL STANDARD

Preliminary injunctive relief is appropriate if the movant "establishe[s] that (1) [it] is likely to succeed on the merits of [its] claim, (2) [it] is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in [its] favor, and (4) a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). Where "the nonmovant is the government, the last two . . . factors 'merge.'" *Id.* (citation omitted). Plaintiffs here—which include an association of cruise-ship operators (CLIA) as well as independent businesses that depend on the cruise industry for a substantial portion of their revenue—satisfy all four of those preliminary-injunction factors.

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

To start, plaintiffs are likely to succeed on the merits of their Tonnage Clause, Rivers and Harbors Act, and First Amendment claims.

### A.    Act 96 Violates the Tonnage Clause

The Tonnage Clause of the U.S. Constitution provides that "[n]o State shall, without the Consent of Congress, lay any Duty of Tonnage." U.S. Const. art. I, § 10, cl. 3. The Framers' goal in drafting that provision was to prevent States from "tax[ing] the privilege of access by vessels to their harbors." *Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n*, 296 U.S. 261, 265 (1935). Accordingly, the Supreme Court has construed the Tonnage Clause broadly to "embrace all taxes

and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port." *Id.* at 265–66; *see Polar Tankers*, 557 U.S. at 8 (same).

Plaintiffs are likely to show that Act 96 imposes at least two impermissible duties of tonnage. *First*, the law imposes a registration fee "as a condition precedent to engaging or continuing in the business of furnishing transient accommodations." HRS § 237D-4(a). In the case of cruise ships, that means cruise-ship operators are required to pay the fee in order to dock in Hawai'i's ports—a paradigmatic "charge for the privilege of entering, trading in, or lying in a port." *Clyde Mallory Lines*, 296 U.S. at 265–66. Indeed, the Supreme Court has previously held that a flat $5 fee imposed on all ships arriving at the port of New Orleans was an impermissible duty of tonnage. *See S.S. Co. v. Portwardens*, 73 U.S. (6 Wall.) 31, 34–35 (1867). The same is true of Act 96's registration fee here.

*Second*, Act 96 imposes additional surcharges on the fares paid by a cruise ship's passengers. Those surcharges are calculated based on the "days docked at any port in the State," Act 96 § 5.1, and are therefore also impermissible "charge[s] for the privilege of . . . lying in a port," *Clyde Mallory Lines*, 296 U.S. at 265–66.

Although the Tonnage Clause does allow States to require payment "for services rendered to and enjoyed by [a] vessel," *id.* at 266 (citations omitted), Act 96's new impositions do not come within that exception. Governor Green heralded

8

the law as "the nation's first climate impact fee, known as the 'Green Fee.'"  Off. of the Governor, *Historic Green Fee Launched to Combat Climate Change in Hawai'i* (June 2, 2025), https://perma.cc/4QJR-7LGR.  And in keeping with that "Green Fee" branding, Act 96 requires the governor to propose projects each year through which the revenue obtained from cruise-ship operators can be spent to "restore . . . native forests," perform "flood mitigation," and support "beach improvement, nourishment, and maintenance projects."  Act 96 § 2.  Those projects, whatever their merits, are not services provided to vessels.

Cruise-ship operators, moreover, *already* pay numerous other charges and fees (not challenged here) for maritime services when their ships visit Hawai'i's ports.  Under longstanding regulations promulgated by the Hawai'i Department of Transportation, for example, CLIA's members pay $5,019 per 24-hour period for dockage of a vessel over 900 feet in length.  *See* HAR § 19-44-20.  CLIA's members also separately pay substantial fees for services such as the provision of clean water, stevedoring, tugboat towage, and port security.  *See* Oates Decl. ¶ 19; Mota Decl. ¶ 16.  Act 96's new surcharges have nothing to do with those services.

The foregoing is sufficient by itself to establish a likely constitutional violation, without regard to any arguably similar charges imposed on land-based accommodations.  *See Polar Tankers*, 557 U.S. at 17 (Roberts, C.J., concurring in part and concurring in the judgment) ("The Tonnage Clause applies to 'any Duty of

Tonnage,' regardless of how that duty compares to other commercial taxes."); *see also* Erik M. Jensen, *Quirky Constitutional Provisions Matter: The Tonnage Clause, Polar Tankers, and State Taxation of Commerce*, 18 Geo. Mason L. Rev. 669, 714 (2011) (explaining that Chief Justice Roberts was correct that the tax at issue in *Polar Tankers* "could have been struck down even if it had not been deemed discriminatory"). But the unconstitutionality of Act 96's surcharges on cruise ships is particularly clear in light of the preferential treatment that the State has afforded to hotels and resorts. *See Polar Tankers*, 557 U.S. at 12 (opinion of Breyer, J.) (explaining that the Tonnage Clause's prohibitions clearly apply "where vessels are not taxed *in the same manner* as the other property of the citizens" (internal quotation marks and alterations omitted)).

As discussed above, Act 96's 11% surcharge—along with the additional 3% surcharge imposed by the Counties—applies not only to the portion of a cruise-ship fare attributable to accommodations, but also to the value of "shipboard services, facilities, meals, and onboard entertainment" included in the voyage. Act 96 § 4.1; *see* p. 6, *supra*. For visitors who stay in hotels or resorts on the islands, in contrast, the Department of Taxation expressly has excluded "[c]harges for guest amenities, including meals, beverages, telephone calls, and laundry," from the base used to calculate 11% and 3% surcharges under Chapter 237D. HAR § 18-237D-1-03(c)(3). Nor does Chapter 237D apply to the cost of such visitors' air travel to Hawai'i. That

10

discrimination against cruise-ship operators and their passengers thus reinforces the unconstitutionality of Act 96.

**B.    Act 96 Also Conflicts with, and Is Thus Preempted by, the Rivers and Harbors Act**

Plaintiffs are also likely to show that Act 96 conflicts with, and is therefore preempted by, the Rivers and Harbors Act, 33 U.S.C. § 5.

As relevant here, the Rivers and Harbors Act provides that "[n]o taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected from any vessel or other water craft . . . by any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States." 33 U.S.C. § 5(b). The statute contains only limited exceptions, covering "fees charged under [33 U.S.C. § 2236]" for port or harbor dues used to pay for harbor navigation construction projects; certain "reasonable fees . . . used solely to pay the cost of a service to the vessel or water craft"; and "property taxes on vessels or watercraft." 33 U.S.C. §§ 5(b)(1)–(3).

Act 96 unquestionably violates the Rivers and Harbors Act's prohibition. The registration fees and surcharges are both "taxes, tolls, operating charges, fees, or . . . other impositions." 33 U.S.C. § 5(b). They are "levied upon or collected from any vessel or other water craft," in that they apply to cruise ships. *Id.*; *see* HRS § 237D-4(a); Act 96 § 5.1. And cruise ships entering, exiting, and docking in Hawaiʻi ports are "operating on . . . navigable waters subject to the authority of the United States."

11

33 U.S.C. § 5(b); *see* 33 C.F.R. § 329.4 ("Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used . . . to transport interstate or foreign commerce.").

Nor can any of the Rivers and Harbors Act's narrow exceptions save Act 96 from preemption. The registration fees and surcharges are not "fees charged under [33 U.S.C. § 2236]" for port or harbor dues used to pay for harbor navigation construction projects. 33 U.S.C. § 5(b)(1). They are not "property taxes." *Id.* § 5(b)(3). And they are not "used solely to pay the cost of a service to the vessel or water craft." *Id.* § 5(b)(2)(A). Indeed, as explained above, *see* pp. 8–9, *supra*, they are not used *at all* to pay the cost of a service to cruise ships. Application of Act 96 to cruise-ship operators therefore conflicts with the Rivers and Harbors Act and is preempted under the Constitution's Supremacy Clause.

## C.    Act 96 Impermissibly Compels Speech

Finally, CLIA is likely to succeed on its claim that Act 96 compels speech by CLIA's cruise-ship operator members in violation of the First Amendment.

"[T]he First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988). Even in the commercial context, States may compel speech only "as long as," among other things, "the compelled disclosure is 'reasonably related' to a substantial

governmental interest." *American Beverage Ass'n*, 916 F.3d at 755 (citation omitted); *see Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1275 (9th Cir. 2023).

As discussed above, *see* p. 5, *supra*, Act 96 requires that cruise-ship operators "conspicuously display[]" information about their Chapter 237D registrations onboard their ships and include related information in "[a]ny advertisement" about cruises that will dock in Hawai'i ports. HRS §§ 237D-4(b)–(c). Those required notices and disclosures are classic compelled speech. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 763–64 (2018) (applying constitutional scrutiny to requirements to "disseminate a government-drafted notice on site" and make disclosures in "advertising materials").

Hawai'i therefore must identify a "substantial governmental interest" that the notice and disclosure requirements serve. *American Beverage Ass'n*, 916 F.3d at 755. For present purposes, CLIA acknowledges that if the underlying regime of cruise-ship surcharges were constitutional, the notice and disclosure requirements likely would be constitutional as well because they are related to that regime. For the reasons already discussed, however, Act 96's cruise-ship surcharges violate both the Tonnage Clause and the Supremacy Clause. And because a State has "no legitimate interest," much less a substantial one, "in enforcing an unconstitutional law," *Cal. Chamber of Com. v. Bonta*, No. 2:19-cv-2019, 2025 WL 1284779, at *13

13

(E.D. Cal. May 2, 2025) (citation and internal quotation marks omitted), Hawaiʻi cannot compel CLIA's members to engage in speech to facilitate Act 96's invalid provisions. *See Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025) (explaining that the government lacks any "legitimate interest in violating the Constitution").

### D. Plaintiffs' Claims Do Not Implicate the Tax Injunction Act

Given the difficulty of defending Act 96 on the merits, Defendants may instead seek to avoid a decision about Act 96's constitutionality by invoking the Tax Injunction Act, 28 U.S.C. § 1341. The Tax Injunction Act provides that "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. For multiple, independent reasons, the Tax Injunction Act does not preclude Plaintiffs' claims here.

### 1. The Tax Injunction Act Does Not Apply to the Hawaiʻi-Based Plaintiffs' Claims

To start, the Tax Injunction Act does not apply at all to claims by Plaintiffs Honolulu Ship Supply Co., Kauaʻi Kilohana Partners, and Aloha Anuenue Tours LLC (collectively, the "Hawaiʻi-based Plaintiffs"). Each Hawaiʻi-based Plaintiff generates a substantial portion of its revenue providing goods or services to cruise-ship operators or cruise-ship passengers and therefore will be injured by the

reduction in demand for Hawaiʻi-bound cruises that Act 96 will cause.[4]  The Hawaiʻi-based Plaintiffs will not be subject to Act 96's surcharges themselves, however, and therefore have no mechanism for challenging those surcharges in state court—let alone a "plain, speedy and efficient" one.  28 U.S.C. § 1341; *see* HRS § 632-1(a) (barring state courts from entering declaratory relief "in any controversy with respect to taxes").

It follows that the Hawaiʻi-based Plaintiffs' claims are not subject to the Tax Injunction Act.  In *Capitol Industries-EMI, Inc. v. Bennett*, 681 F.2d 1107 (9th Cir. 1982), the Ninth Circuit held that the Tax Injunction Act did not block a challenge to a California tax brought by a plaintiff that was not itself a taxpayer and thus lacked any "administrative or judicial remedy" under California law.  *Id.* at 1118.  The court explained that "[a] nontaxpayer that has stated a claim with respect to an assessment or collection is entitled to a judicial remedy in which they can participate as a party."  *Id.* at 1119.  Accordingly, "[b]ecause California d[id] not provide EMI with an

---

[4] Even in this preliminary posture, the record shows that Act 96 will reduce demand for cruises in Hawaiʻi and reduce the amount of time cruise ships will spend in Hawaiʻi ports, harming businesses that depend on cruise ships and passengers for significant portions of their revenue.  *See* Aymonod Decl. ¶¶ 7–15; Atkins Decl. ¶¶ 9–14; Maeda Decl. ¶¶ 5–10; *see also* Part II, *infra* (discussing harms to tourist industry).  Those economic injuries satisfy Article III's injury-in-fact requirement and give the Hawaiʻi-based Plaintiffs standing to sue.  *See Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2134, 2137 (2025) (where third parties are likely to "react . . . in predictable ways" and cause "downstream or upstream economic injuries," those injuries support standing) (internal quotation marks omitted).

effective state remedy for its claims," the Ninth Circuit held that "Section 1341 does not bar the district court from exercising subject matter jurisdiction over such claims." *Id.* So too here. Because Hawai'i law affords the Hawai'i-based Plaintiffs no state-law mechanism by which to assert their valid Tonnage Clause and Rivers and Harbors Act claims, the Tax Injunction Act does not bar this court from exercising jurisdiction over those claims.

### 2. The Tax Injunction Act Also Does Not Bar Plaintiff CLIA's Challenges to the Surcharges

Because the Hawai'i-based Plaintiffs' Tonnage Clause and Rivers and Harbors Act claims are sufficient on their own to warrant a preliminary injunction against the cruise-ship surcharges, this Court need not consider CLIA's similar but separate challenges to the surcharges. To the extent the Court reaches the issue, however, the Tax Injunction Act does not bar CLIA's challenges to the surcharges, either. That is because the State and Counties do not provide mechanisms to challenge the surcharges that are "plain, speedy and efficient." 28 U.S.C. § 1341.

One mechanism for challenging the charges would be to force an assessment. If a cruise-ship operator withholds payment of the unconstitutional surcharges, the Department of Taxation or an individual county eventually could make an "assessment" of the tax, which the operator then could challenge in Hawai'i's Tax Appeal Court. *See* HRS § 232-16. That approach, however, would require that the operator voluntarily "fail[] to make a return" or make an "underpayment of tax,"

16

subjecting the operator to substantial penalties of up to 25%.  HRS §§ 231-39(b), 237D-9(a).  Moreover, because the Department of Taxation or individual county tax authority has "three years [from] the due date prescribed for the filing of the return" to make an assessment, HRS § 237D-9, proceeding in this fashion would be exceedingly slow.  The first annual return for Act 96's charges is not due until April 2027, meaning a cruise-ship operator might not receive an assessment until 2030.  Only after receiving that assessment could the operator *begin* an appeal in the Hawai'i courts—more than four years after Act 96 takes effect.  HRS § 232-16.

The assessment procedure thus is not "speedy" within the meaning of the Tax Injunction Act.  To be "speedy," a remedy must "not entail a significantly greater delay than a corresponding federal procedure."  *Hyatt v. Yee*, 871 F.3d 1067, 1073 (9th Cir. 2017) (citation omitted).  Although state-law remedies need not be "better than the remedy which might be available in the federal courts," the "speedy" inquiry still requires a comparison to equivalent federal procedures.  *Id.* (citation omitted). Here, the comparison is stark:  challenging an assessment could result in a four-year delay before even beginning a case in a court with jurisdiction, whereas the median time to resolution for a civil case in this District is 5.4 months.  *See* Jud. Conf. of the United States, *National Judicial Caseload Profile*, Hawaii (Mar. 2025), https://perma.cc/HHN3-QNHC.

17

Cruise-ship operators unwilling to risk substantial penalties by forcing an assessment have an alternative option—but that option is flawed as well. Specifically, an operator could pay the unconstitutional surcharges; seek refunds of those surcharges from the respective state and county officials on the ground that they are unconstitutional; and then attempt to challenge the denial of those refunds in Hawai'i's Tax Appeal Court. *See* HRS § 232-14.5. Proceeding in that fashion would be inadequate, however, because while state law provides for judicial review of refund denials by the Hawai'i Department of Taxation, *see id.*, no similar mechanism of judicial review exists for Chapter 237D refund denials by county-level officials.[5] CLIA members therefore have no option to obtain refunds of the *full* amount of the unconstitutional surcharges in "the courts of [the] State," 28 U.S.C. § 1341, meaning that the Tax Injunction Act does not apply.

Even if the State and all four Counties provided for judicial review of refund denials, moreover, the resulting process would not be "efficient." 28 U.S.C. § 1341. As discussed above, cruise-ship operators are required to make monthly payments

---

[5] The counties of Kaua'i, Honolulu, and Hawai'i allow refund requests directed to county tax officials, *see* Kaua'i Cnty. Code § 5-4.19; Rev. Ord. Hon. § 8A-1.14; Cnty. of Haw., Dep't of Fin., *Transient Accommodations Tax Refund Request Voucher* (Oct. 2024), https://tinyurl.com/5ymkst58, but they appear to provide no mechanism by which a cruise-ship operator could appeal the denial of a refund to the Tax Appeal Court (or any other court). HRS § 232-14.5 permits administrative appeals from refunds denied "by the department of taxation" at the state level, but the counties do not incorporate § 232-14.5 into their ordinances.

of the surcharges imposed under Chapter 237D.  Accordingly, a cruise-ship operator would need to file as many as five distinct refund requests each month, plus five refund requests with respect to any additional end-of-year payments, for a total of up to 65 refund requests over the course of the year.  For CLIA members that do business through multiple, separately incorporated cruise-ship operators, such as Royal Caribbean Group and Carnival Corporation, the total number of refund requests each year potentially could be in the hundreds.  *See* Oates Decl. ¶ 37; Mota Decl. ¶ 31–32.

Forcing CLIA members to file all of those separate refund requests, then file judicial challenges when they are denied, is not the sort of "efficient" path to state-court review contemplated by the Tax Injunction Act.  28 U.S.C. § 1341.  Indeed, the Supreme Court has held that the Tax Injunction Act did not apply in similar circumstances where a taxpayer otherwise would have been required to file "three hundred separate claims in fourteen different counties to protect [a] single federal claim."  *Ga. R.R. & Banking Co. v. Redwine*, 342 U.S. 299, 303 (1952).  The "ineffectual activity" and "unnecessary expenditure of time or energy" that Hawaiʻi's refund process would require in the circumstances here likewise render the Tax Injunction Act inapplicable.  *Hyatt*, 871 F.3d at 1073 (citation omitted).[6]

---

[6] The decision in *Air Polynesia, Inc. v. Freitas*, 742 F.2d 546 (9th Cir. 1984), is not to the contrary.  There, the court considered whether Hawaiʻi's then-existing refund

### 3.    The Tax Injunction Act Does Not Apply to CLIA's Challenge to Act 96's Registration Fees

The Tax Injunction Act also does not bar CLIA's challenge to Act 96's registration fees, for two independent reasons.

*First*, Hawaiʻi law apparently provides no mechanism at all by which CLIA's members could recover registration fees once they are paid, *see* Compl. ¶¶ 38, 75, and therefore does not satisfy the Tax Injunction Act's requirement of a providing a "plain, speedy and efficient" remedy in the state courts.  28 U.S.C. § 1341.

*Second*, the registration fee also is not a "tax" covered by the Tax Injunction Act but rather a "regulatory fee." *Bidart Bros. v. Cal. Apple Comm'n*, 73 F.3d 925, 930 (9th Cir. 1996).  To distinguish taxes from fees, the Ninth Circuit considers, *inter alia*, "the parties upon whom the assessment is imposed" and "whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed." *Id.* at 931.  Those factors strongly indicate that the registration fee is just that—a fee. *Id.*  The fee is "imposed upon a narrow class" of entities—not on the general public—and appears to be used for the purpose of processing registrations, not raising "general revenues."

---

procedures were rendered inadequate on account of "the amount of the assessment" at issue in that case.  *Id.* at 548.  The court held that the mere amount at issue did not make state-law procedures inadequate under the Tax Injunction Act.  *Id.*  The court did not consider any of the arguments that CLIA makes here and did not address any of the Counties' assessment or refund procedures.

*Id.* at 931–32.  And if any doubt remained, Hawaiʻi law itself designates the payment a "one-time *fee*," HRS § 237D-4(a) (emphasis added), in contrast to the "tax" imposed by other provisions of Chapter 237D, *see, e.g.*, HRS § 237D-2.

### 4.    The Tax Injunction Act Does Not Apply to CLIA's First Amendment Claims

Finally, the Tax Injunction Act does not apply to CLIA's First Amendment claims because those claims do not seek to "enjoin, suspend or restrain the assessment, levy or collection of any tax," 28 U.S.C. § 1341, but simply challenge separate compelled-speech requirements.

The Supreme Court's decision in *Direct Marketing Ass'n v. Brohl*, 575 U.S. 1 (2015), squarely controls here.   In *Direct Marketing*, the Supreme Court considered First Amendment challenges to certain "notice and reporting requirements" that Colorado had imposed on online merchants.  *Id.* at 6.  The requirements directed merchants to "send a report to all Colorado purchasers who bought more than $500 worth of goods from the retailer in the previous year," and provide other information aimed at assisting Colorado in its "process of assessment and collection" of sales taxes.  *Id.* at 5, 11.  The Court held that the Tax Injunction Act did not bar a challenge to those requirements, even though the requirements might in some way "improve Colorado's ability to assess and ultimately collect its sales and use taxes from consumers."  *Id.* at 11.  The Court explained that, consistent with the statutory text, "the TIA is not keyed to all activities that may improve a

21

State's ability to assess and collect taxes." *Id.* Rather, the statute is "keyed to the acts of assessment, levy, and collection themselves." *Id.* at 11–12. Because a challenge to "notice and reporting requirements" is not a challenge to assessment, levy, or collection, the plaintiffs' claims were not barred. *Id.* at 12.

This case is on all fours. CLIA's compelled speech claims concern only the requirements to post information about Chapter 237D registrations and include such information in advertisements. *See* Section I.C. Those requirements are even less related to assessment and collection than were the requirements in *Direct Marketing*. The Tax Injunction Act therefore does not apply to them at all.

## II.    PLAINTIFFS FACE IRREPARABLE HARM

For the foregoing reasons, Plaintiffs are likely to succeed on the merits of their Tonnage Clause, Rivers and Harbors Act, and First Amendment claims. In addition, Plaintiffs also are "likely to suffer irreparable harm absent the preliminary injunction." *Baird*, 81 F.4th at 1040.

*First*, CLIA's members face immediate harms from the reduction in current and future demand caused by Act 96. As the declarations of Elizabeth Oates and Marcos Mota explain, cruise itineraries are set far in advance, and passengers generally purchase tickets many months before departure. *See* Oates Decl. ¶¶ 21–26; Mota Decl. ¶¶ 18–23. CLIA's members already are selling tickets for cruises that will be subject to Act 96's new surcharges and are in the process of establishing

itineraries for other cruises that likewise would be subject to those surcharges if they dock in Hawai'i. *See* Oates Decl. ¶¶ 25–27; Mota Decl. ¶¶ 22–24. By significantly increasing the overall price of cruises to Hawai'i, Act 96 will cause some families to vacation elsewhere instead of purchasing tickets for cruises scheduled to dock in Hawai'i in 2026. *See* Oates Decl. ¶ 9–14; Mota Decl. ¶¶ 9–11. CLIA members will be harmed by the resulting loss of revenue. And because of the sovereign immunity enjoyed by the State itself, they "cannot . . . recover monetary damages" for those harms after final judgment, making them irreparable. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).

Relatedly, to avoid the increased expense (and reduced demand) caused by Act 96, CLIA members are considering redeploying some ships on itineraries that do not dock in Hawai'i or that spend less time in Hawai'i ports. *See* Oates Decl. ¶¶ 27–29; Mota Decl. ¶¶ 24–26. Even if Act 96 ultimately is declared unconstitutional, it likely will not be feasible for CLIA members to modify those itineraries and thereby attract passengers interested in reasonably priced cruises to Hawai'i. *See* Oates Decl. ¶ 30; Mota Decl. ¶ 27.

*Second*, the Hawai'i-based Plaintiffs likewise face substantial lost revenue due to a reduction in cruise-ship and cruise-passenger business. *See* Aymonod Decl. ¶¶ 7–15; Atkins Decl. ¶¶ 9–14; Maeda Decl. ¶¶ 5–10. As commentators explained when opposing the bill, "a large body of research demonstrates that increasing taxes

23

on tourists can also affect both the competitiveness of Hawaiʻi's tourism industry and the health of local businesses that depend upon tourism dollars." *See Hearing on S.B. 1396 Before the H. Comm. on Fin.*, 2025 Leg., 33d Sess. (Haw. 2025) (statement of Ted Kefalas, Dir. of Strategic Campaigns, Grassroot Inst. of Haw.), https://perma.cc/9TW8-KFJV.  One 2017 study, for example, found that "[c]oastal and leisure destinations" are particularly susceptible to those adverse effects.  *Id.* Another study, conducted in the Maldives, found that "a 10% increase in tourism taxes reduces demand by 5.4%."  *Id.*  And even the Hawaiʻi Tourism Authority has admitted that Act 96 may "significantly reduce the amount of on-island spend through excursions, shopping, etc."  *Id.* (statement of Caroline Anderson, Interim President & CEO, Haw. Tourism Auth.).  Act 96 thus will harm the Hawaiʻi-based Plaintiffs and other Hawaiʻi businesses that depend on cruise ships and cruise-ship passengers for a substantial portion of their revenue.

*Third*, "[t]he deprivation of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Wheat Growers*, 85 F.4th at 1283 (citation and internal quotation marks omitted).  Act 96 would compel CLIA's members to dilute their advertising messages by "call[ing] attention to the notice, instead of [their] own message," *Becerra*, 585 U.S. at 778, and would force them to appear to support a law to which they strenuously object.  Those constitutional harms, too, call for immediate relief.

24

III.  **THE PUBLIC INTEREST AND BALANCE OF EQUITIES ALSO FAVOR PRELIMINARY INJUNCTIVE RELIEF**

Finally, the public interest and balance of equities also strongly favor preliminary injunctive relief.  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Baird*, 81 F.4th at 1042 (citation omitted).  Accordingly, Ninth Circuit "caselaw clearly favors granting preliminary injunctions to a plaintiff . . . who is likely to succeed on the merits of his constitutional claim."  *Id.* (citation and brackets omitted).

Defendants "cannot reasonably assert that [they are] harmed in any legally cognizable sense by being enjoined from constitutional violations."  *Id.* (citation omitted).  Government defendants "cannot suffer harm from an injunction that merely ends an unlawful practice."  *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).  On the other hand, numerous parties face harm if Act 96 is enforced, including not only Plaintiffs but also cruise passengers themselves and other Hawai'i businesses and workers that depend on cruises for their livelihoods and employment.

To prevent those harms, the Court should grant Plaintiffs' motion and enjoin Act 96 pending final judgment here.

## CONCLUSION

The Court should enter an order preliminarily enjoining enforcement of (i) Act 96's 11% state and 3% county surcharges, (ii) Act 96's registration fee, and (iii) Act 96's compelled notice and disclosure requirements.

DATED:      Honolulu, Hawaiʻi, August 27, 2025.

/s/ *Jeffrey S. Portnoy*

JEFFREY S. PORTNOY
TREVER K. ASAM
LINDSAY N. MCANEELEY
BRADLEY J. BONDI*
BENJAMIN W. SNYDER*
RONALD K. ANGUAS, JR.*

Attorneys for Plaintiffs
CRUISE LINES INTERNATIONAL
ASSOCIATION, INC.; HONOLULU
SHIP SUPPLY CO.; KAUAʻI
KILOHANA PARTNERS; and
ALOHA ANUENUE TOURS LLC

\* *Pro Hac Vice Motions Forthcoming*