IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CRUISE LINES INTERNATIONAL ASSOCIATION, INC., ET AL.,<br><br>Plaintiffs,<br><br>vs.<br><br>GARY S. SUGANUMA, ET AL.,<br><br>Defendants. | CIV. NO. 25-00367 JAO-KJM<br><br>ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' JOINT MOTION TO DISMISS (ECF NO. 53); (2) DENYING PRIVATE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 28); AND (3) DENYING THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 97) |

**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' JOINT MOTION TO DISMISS (ECF NO. 53); (2) DENYING PRIVATE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 28); AND (3) DENYING THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 97)**

Hawaiʻi imposes a transient accommodation tax on short-term accommodations like hotels and other vacation rentals, and its counties exact a further surcharge on such rentals. The tax statutes also require businesses that provide transient accommodations to pay a small one-time registration fee and conspicuously display notice of such registration. With the passage of Act 96, which is scheduled to take effect January 1, 2026, Hawaiʻi extended this tax and the registration and notification requirements to cruise ships that dock at the state's ports. The plaintiffs—an organization representing cruise lines, a few local

businesses, and after intervention, the United States ("Federal Government")[1]—
challenge that new law, arguing that it violates the Tonnage Clause of the
Constitution and conflicts with the Rivers and Harbors Appropriation Act of 1884
("RHA").

The Tonnage Clause provides that "[n]o State shall, without the Consent of
Congress, lay any Duty of Tonnage."  U.S. Const. art. I, § 10, cl. 3.  Courts have
interpreted it to mean that states may not charge vessels for the privilege of using
their ports.  Similarly, the RHA prohibits non-federal parties from imposing taxes
on vessels "operating on any navigable waters" of the United States.  33 U.S.C. §
5(b).

Plaintiffs contend that Act 96 runs afoul of both because it functions as a tax
on the privilege of entering Hawaii's ports and the use of its navigable waters.
Plaintiff CLIA also claims that Act 96's notification requirements infringe on
cruise lines' First Amendment right against compelled speech.  The defendants—a

---

[1] In addition to the Federal Government, the plaintiffs are:  Cruise Lines
International Association, Inc. ("CLIA"), Honolulu Ship Supply Co., Kaua'i
Kilohana Partners, and Aloha Anuenue Tours LLC (the latter three are the "Local
Business Plaintiffs," and collectively with CLIA, "Private Plaintiffs").  The Court
will refer to all of the plaintiffs as "Plaintiffs."

state official, four counties, and agency heads of those counties[2]—respond that the Plaintiffs here either lack standing, that this lawsuit is barred by the Tax Injunction Act and principles of comity, or that Plaintiffs' claims likely fail on the merits.

Before the Court are three motions. Private Plaintiffs move for a preliminary injunction to enjoin enforcement of Act 96 before it takes effect ("Private PI Motion"). *See* ECF No. 28. Defendants in turn move to dismiss Private Plaintiffs' Complaint ("Motion to Dismiss"). *See* ECF No. 53. The Federal Government also filed a motion for preliminary injunction after intervening in the case ("Federal PI Motion"). *See* ECF No. 97. For the following reasons, the Court GRANTS IN PART AND DENIES IN PART Defendants' Motion to Dismiss, DENIES what remains of the Private PI Motion, and DENIES the Federal Government's PI Motion.

This case is about more than just the tourism business—instead, it raises multiple (and sometimes competing) federalism concerns. As may be obvious

---

[2] Defendants are: Gary S. Suganuma, the Director of the Hawai'i Department of Taxation; Hawai'i Department of Taxation; Chelsie Sakai, County Finance Director for the County of Kaua'i; County of Kaua'i; Andrew T. Kawano, Director of the Department of Budget and Fiscal Services for the City and County of Honolulu; City and County of Honolulu; Marcy Martin, Director of the Department of Finance for the County of Maui; County of Maui; Diane Nakagawa, Director of the Department of Finance for the County of Hawai'i; and County of Hawai'i. The Court will refer to the state and its officials as the "State Defendants," to the counties and officials associated with the counties as the "County Defendants," and to all the defendants as "Defendants."

from this brief synopsis, the Tonnage Clause and RHA assert federal supremacy over interstate maritime commerce, yet here, that interest creates tension with the state's critical power to generate revenue from businesses operating within its borders.  Further, the case implicates questions of balance and respect between state and federal court systems:  in recognition of the importance of a state's power to levy taxes, Congress—through the Tax Injunction Act—has restricted federal court jurisdiction over state tax matters and channels those tax challenges through the state's courts.  Underpinning all of this are the more typical jurisprudential questions of who may bring suit in federal court.  Acknowledging these layers of tension, and at this early stage of the litigation, the Court's conclusion tries to balance the competing interests.

To be more direct:  while the Court concludes that Plaintiffs have not established that they are *likely* to succeed on the merits because enjoining Act 96 would seemingly give cruise lines preferential treatment over land-based transient accommodations businesses, the Court acknowledges that the Tonnage Clause and the RHA are not litigated often and that the Court may ultimately come to a different conclusion about Act 96 later.  Nevertheless, because of the "vital importance" of taxes to the states, *Arkansas v. Farm Credit Servs. of Cent. Arkansas*, 520 U.S. 821, 826 (1997), and because Congress has clearly expressed its intent "to prevent federal-court interference with the assessment and collection

4

of state taxes," *California v. Grace Brethren Church*, 457 U.S. 393, 411 (1982),

the Court treads carefully and denies the extraordinary relief of a preliminary

injunction.  In short, the Court declines at this stage to halt the implementation of

the transient accommodation tax on cruise ships in Hawaiʻi.

## I.    BACKGROUND

**A.    Facts**

### 1.    Transient Accommodation Tax and Act 96

Chapter 237D of the Hawaiʻi Revised Statutes ("HRS") sets forth the state's

transient accommodation tax scheme.  While Act 96 amends HRS § 237D to

impose the transient accommodations tax and related requirements on cruise lines,

it does not change other mandates of Chapter 237D.[3]  As such, several current

requirements of § 237D that pre-date the addition of cruise lines into the scheme

remain relevant.

The law levies a tax "on the gross rental or gross rental proceeds derived

from furnishing transient accommodations."  HRS § 237D-2(a) ("State Tax").  It

defines transient accommodations to "mean[] the furnishing of a room, apartment,

suite, single family dwelling, shelter, or the like to a transient for less than one

hundred eighty consecutive days for each letting in a hotel, apartment hotel, motel,

---

[3]  The full text of Act 96 is available at
https://www.capitol.hawaii.gov/sessions/session2025/bills/GM1196_.PDF (last
visited Dec. 23, 2025)

condominium . . . , or other place in which lodgings are regularly furnished to transients." *Id.* § 237D-1. "Gross rental proceeds" does not include meals purchased at or included by the facility taxed. *See* Haw. Admin. R. § 18-237D-1-03(c).

In addition to the State Tax on transient accommodations, the law also allows counties to impose their own charge of up to 3% of gross rental proceeds on transient accommodations. *See id.* ¶ 237D-2.5(a); ECF No. 1 ¶ 32. The Counties of Maui, Kauaʻi, and Hawaiʻi have imposed the 3% surcharge, and the City and County of Honolulu does so for property in the City ("County Surcharges"). *See* ECF No. 1 ¶¶ 33–34. Taxpayers must pay the State Tax and each County Surcharge monthly, and submit a yearly return to the State and counties and pay any remaining taxes due. *See id.* ¶¶ 40–41 nn.11–12 (citing the relevant state and county provisions).

The transient accommodations tax also includes certain registration and notice requirements. "As a condition precedent to engaging or continuing in the business of furnishing transient accommodations," the taxpayer subject to the law must register its business with the State and pay a one-time fee. HRS § 237D-4(a). The fee for a business offering six or more units of transient accommodation is $15 ("Registration Fee"). *Id.* Businesses are then required to conspicuously display on-site their registration certificate or notice of where someone could view the

6

certificate. *Id.* § 237D-4(b). They must also "conspicuously provide" in "[a]ny advertisement, including an online advertisement, for any transient accommodation" their "registration identification number or an electronic link to the registration identification number," (with the display of the certificate, "Notice Requirements"). *Id.* § 237D-4(c).

Most pertinently to the instant dispute though, Act 96 amends HRS § 237D-2 to impose on the "operator of a cruise ship" an 11% tax "on all gross rental proceeds derived from cruise fares prorated by the percentage of days docked at any port in the State in comparison to the total number of days of the voyage." *See* Act 96 § 5; ECF No. 1 ¶¶ 30–31. Act 96 defines "cruise fare" to mean:

> [T]he total amount paid by a transient for a cruise ship cabin on a cruise ship, inclusive of any *mandatory fees* imposed by a cruise ship operator, owner, or representative thereof on a transient *for the use of shipboard services, facilities, meals, and onboard entertainment, but does not include optional charges for shipboard services, meals, excursions, and onboard entertainment beyond the mandatory fee amount*.

Act 96 § 4.1 (emphases added).

By incorporating cruise lines into the transient accommodations tax, Act 96 also subjects the operators to the other requirements of HRS § 237D. Thus, cruise operators must pay the County Surcharges and the one-time $15 Registration Fee. *See* ECF No. 1 ¶¶ 33–37. They must also comply with the Notice Requirements. *See id.* ¶¶ 45–46.

Relevantly, the revenue raised by Act 96 doesn't go toward vessel-related services. Instead, when Governor Josh Green signed Act 96 into law on May 27, 2025, he touted it as the country's first "climate impact fee," and estimated that it would generate $100 million per year to "fund diverse projects focusing on environmental stewardship, climate resilience and sustainable tourism." *Id.* ¶ 29.

### 2. Plaintiffs and their Alleged Harms

CLIA is a global non-profit that "advocates for the interests of the cruise community and works to protect its members' legal rights in the jurisdictions in which they operate, including Hawai'i." *Id.* ¶ 8. Its members include recognizable cruise line brands that "collectively represent 95% of global cruise passenger capacity." *See id.* A CLIA official attests that the organization's "purpose [in part] is to advocate for the cruise industry," which it does via "discussions with policymakers" and occasional "litigation to advance the interests of CLIA's members." *See* ECF No. 28-2 ¶¶ 4–5. CLIA claims that Act 96 will injure its "members sailing to Hawai'i ports by burdening them with unconstitutional fees and surcharges, reducing passenger demand for voyages that dock in Hawai'i, and compelling them to engage in speech." *Id.* ¶ 6.

Unlike CLIA's members, the Local Business Plaintiffs do not operate cruise lines and instead either provide services to the ships or tourist experiences for the passengers. *See* ECF No. 1 ¶¶ 9–11. Honolulu Ship Supply Co. is a "provider of

8

ship provisioning, technical supplies, waste management, and custom services for vessels of all kinds, including cruise ships." *Id.* ¶ 9.  It derives more than 50% of its revenue from servicing cruise ships and operates on thin margins.  ECF No. 28-5 ¶¶ 5, 11.  Kaua'i Kilohana Partners runs Kilohana Plantation where visitors can take scenic train rides, drink some rum, and "interact with local livestock."  ECF No. 1 ¶ 10; ECF No. 28-7 ¶ 7.  The plantation is a short drive from the nearest cruise-ship terminal and "hosts premium luaus for cruise ship passengers at least once a week," which generate almost $1.5 million in annual revenue.  ECF No. 28-7 ¶ 6.  The final Local Business Plaintiff, Aloha Anuenue Tours, runs a tour company on the Big Island with all of its tour revenue coming from cruise-ship passengers.  ECF No. 1 ¶ 11; ECF No. 28-6 ¶ 4.  Each Local Business Plaintiff contends that Act 96 will cause them economic harm because the increased tax burden will lead to higher prices for passengers, which will cause fewer ships and passengers to visit Hawai'i, and will reduce passengers' spending money for excursions.  *See* ECF No. 1 ¶¶ 31, 55–70.

The Federal Government asserts an interest in the action because it "safeguards the supremacy of Federal laws and ensures States do not violate the United States Constitution."  ECF No. 91 ¶ 10.

## B.    Procedural History

Private Plaintiffs filed suit on August 27, 2025 and assert six causes of

action.  *See generally* ECF No. 1.  CLIA claims that Act 96 violates the Tonnage

Clause of the United States Constitution (Count I), *id.* ¶¶ 81–92, is preempted by

the RHA (Count III), *id.* ¶¶ 97–104, and violates the First Amendment by

compelling speech (Count V), *id.* ¶¶ 109–13.  The Local Business Plaintiffs also

bring causes of action for violation of the Tonnage Clause and preemption by the

RHA (Counts II, IV).  *Id.* ¶¶ 93–96, 105–08.  In Count VI, Private Plaintiffs

collectively assert a Declaratory Relief claim.  *Id.* ¶¶ 114–18.[4]

Private Plaintiffs also filed their Private PI Motion at the inception of the

case.  ECF No. 28.  Before responding to the Private PI Motion, Defendants filed

their Motion to Dismiss on September 19, 2025.  The parties then each filed

oppositions to the other sides' motions, ECF Nos. 55 (opposition to Private PI

Motion), 56 (opposition to Motion to Dismiss), and replies in support of their own,

ECF Nos. 57 (Private PI Motion reply), 59 (Motion to Dismiss reply).  The Court

held a hearing on both motions on November 14, 2025.  After the hearing, the

Court directed Private Plaintiffs and Defendants to file supplemental briefing

---

[4]  The Complaint doesn't specify which claims Private Plaintiffs assert against
which Defendants, but both sides seem to treat it as alleging all counts against all
Defendants.  *See* ECF No. 53 at 32; ECF No. 56 at 31.

regarding whether Hawaiʻi offered an adequate forum for Private Plaintiffs to assert their challenges to the Registration Fee and the Notice Requirements. *See* ECF No. 73. The parties timely filed the supplemental briefing. *See* ECF Nos. 76, 77, 78, 83, 84.

On the eve of the hearing regarding the Private PI Motion and the Motion to Dismiss, the Federal Government moved to intervene as a plaintiff in the action, *see* ECF No. 69 ("Motion to Intervene"), and moved to stay resolution of the Motion to Dismiss pending resolution of the Motion to Intervene, *see* ECF No. 70 ("Motion to Stay"). Chief Magistrate Judge Kenneth J. Mansfield granted the Motion to Intervene over Defendants' opposition. *See* ECF Nos. 90 (Order granting intervention), 81 (Defendants' opposition). Because the Motion to Dismiss was still pending at that time, the Court denied the Motion to Stay as moot. ECF No. 95.

After the Court granted the Motion to Intervene, the Federal Government filed its Intervenor Complaint on December 5, 2025. ECF No. 91. It alleges that the Registration Fee and transient accommodations tax on cruise ships violate the Tonnage Clause, and that those same aspects of Act 96 are preempted by the RHA and thus violate the Supremacy Clause. *See id.* ¶¶ 47–69. The Federal Government and Defendants then filed a status report, informing the Court that the Federal Government intended to move for a preliminary injunction, ECF No. 92,

11

so the Court set an expedited briefing schedule on the Federal Government's

anticipated PI Motion.  *See* ECF No. 93.  The Federal Government filed its motion

on December 10, 2025 ("Federal PI Motion").  ECF No. 97.  Defendants opposed

on December 15, ECF No. 98, and the Federal Government filed its reply the next

day, ECF No. 100.

The Court held a hearing on the Federal PI Motion on December 17, 2025.

## II.    DISCUSSION

### A.    Jurisdiction

The Court begins by considering its jurisdiction over this case.  Defendants

assert several jurisdictional and prudential arguments as to why this Court must or

should dismiss Private Plaintiffs' Complaint.  *See generally* ECF No. 53.  And,

while not yet moving to dismiss the Federal Government from this case,

Defendants nevertheless contend that the Federal PI Motion should be denied

based on lack of jurisdiction.  *See* ECF No. 98 at 8–16, 24–26.  The Court

concludes that: (1) it lacks jurisdiction over CLIA's claims challenging the State

Tax and County Surcharges; and (2) it lacks jurisdiction over the Local Business

Plaintiffs' case.

The Court also concludes that it likely has jurisdiction over the Federal

Government's claims, and thus declines to deny the Federal PI Motion on that

ground.

### 1.    Legal Standard

Under Federal Rule of Civil Procedure ("Rule") 12(b)(1), a party may move to dismiss a claim based on lack of subject matter jurisdiction, including the absence of standing.  *See* Fed. R. Civ. P. 12(b)(1); *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121 (9th Cir. 2010).  Federal courts are presumed to lack subject matter jurisdiction, and the plaintiff bears the burden of establishing that jurisdiction is proper.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Dismissal under Rule 12(b)(1) is warranted when the plaintiff fails to meet this burden.  *See Chandler*, 598 F.3d at 1122.

### 2.    Analysis

Before turning to the substance of the jurisdictional arguments, it is important to recall the three prongs of the tax scheme that Plaintiffs challenge:  (1) the State Tax and County Surcharges; (2) the Registration Fee; and (3) the Notice Requirements.

Defendants move to dismiss Private Plaintiffs' Complaint on the grounds that Private Plaintiffs lack standing to challenge any of these prongs, *see* ECF No. 53 at 23–28; ECF No. 55 at 17–23, and that the Tax Injunction Act or principles of comity require dismissal of all claims, ECF No. 53 at 14–21; ECF No. 55 at 10–15.

The Court considers CLIA's and the Local Business Plaintiffs' standing separately and concludes that, while both have sufficiently alleged Article III

13

standing at this stage, the prudential principle against third-party standing prevents the Local Business Plaintiffs from maintaining the instant suit.

As to CLIA, the Court concludes that the Tax Injunction Act deprives the Court of jurisdiction over claims regarding the State Tax and County Surcharges. But the Court determines that CLIA's claims related to the Registration Fee and Notice Requirements are not subject to dismissal under the doctrine of comity because Hawaiʻi lacks an adequate state remedy to challenge those parts of Act 96.

Finally, the Court concludes that the Federal Government likely has standing and that the Tax Injunction Act does not bar the Federal Government's claims.

### a.  *Standing*

The standing doctrine encompasses "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citation omitted).  Defendants argue that both CLIA and the Local Business Plaintiffs have failed to establish Article III standing, while the Local Business Plaintiffs also run afoul of prudential standing concerns because they attempt to assert the rights of third parties.  *See* ECF No. 53 at 23–28. Defendants also argue that the Federal Government lacks a concrete interest in the case and that the Federal PI should be denied on standing grounds.  *See* ECF No. 98 at 24–26.

To enjoy constitutional standing under Article III, "plaintiffs must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *LA All. for Human Rights v. Cnty. of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

While the constitutional inquiry relates to a court's power to hear the case, prudential standing concerns are "essentially matters of judicial self-governance" that typically relate to which "class of persons . . . may invoke the courts' decisional and remedial powers." *See Warth*, 422 U.S. at 498–99. The most pertinent prudential limitation here is so-called third-party standing. Under this principle, even when a plaintiff has alleged Article III injury, the plaintiff must still assert its "own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties." *Id.*

### i. CLIA

Defendants attack CLIA's standing on two grounds that don't require much analysis: (1) that CLIA has failed to plead associational standing and (2) that it cannot maintain a pre-enforcement challenge to Act 96. Both challenges fail.

To establish associational standing, an organization must demonstrate "that: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c)

neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1143 (9th Cir. 2024) (citation omitted).  Defendants contend that CLIA fails to "clearly state" the organization's purpose and has thus not pleaded that its purpose is "germane" to the interests at stake (lower taxes for cruise ships).  *See* ECF No. 53 at 27.  But CLIA alleges it "advocates for the interests of the cruise community and works to protect its members' legal rights in the jurisdictions in which they operate, including Hawai'i."  ECF No. 1 ¶ 8.  The Court has no trouble concluding that CLIA's purpose of protecting its members' legal rights is germane to bringing a legal challenge to a proposed tax.[5]

Defendants' argument regarding pre-enforcement standing also falters.  To maintain a pre-enforcement attack, a plaintiff must allege an intention to engage in a course of conduct arguably prescribed by the statute and the threat of enforcement must be "substantial."  *See Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014)).  Here, Defendants contend that CLIA cannot meet those requirements because CLIA itself is not subject to Act 96, and therefore will not engage in the proscribed conduct or face enforcement.  *See* ECF No. 53 at 36–27.  But that

---

[5] Defendants do not contest the other two elements of associational standing, which are easily satisfied in any event.

16

argument entirely misses the point of associational standing. CLIA brings suit on

behalf of its members rather than based on any injury to itself, *see*, *e.g.*, ECF No. 1

¶ 103–04 (discussing members' injuries); *see also* ECF No. 56 at 22 (arguing

associational standing), and alleges that its members sail to Hawaiʻi, ECF No. 1

¶¶ 8, 26. There's no suggestion that those members who sail to Hawaiʻi are

exempt from the act or will avoid enforcement. The allegations are sufficient to

establish that CLIA's members have pre-enforcement standing.

### ii.    *Local Business Plaintiffs*

By contrast, the Local Business Plaintiffs present some thornier questions on

both constitutional and prudential standing because they are not subject to Act 96.

### 1. Constitutional Standing

On the Article III front, Defendants assert that the Local Business Plaintiffs

allege economic harms that are too attenuated from Act 96 or too speculative to

satisfy the injury-in-fact prong. *See* ECF No. 53 at 23–25. They also argue that

these plaintiffs may not maintain a pre-enforcement challenge because the law

doesn't regulate them. *See id.* The Court addresses each argument in turn.

The Local Business Plaintiffs allege that by imposing the surcharge on

cruise ships, Act 96 will increase the price of cruises to Hawaiʻi, thereby reducing

the number of ships and passengers to visit the islands. *See* ECF No. 1 ¶ 56. This,

they say, would also deplete passengers' spending money for on-island excursions,

which in combination with the decreased volume of visitors, leads to less revenues for businesses that depend on the cruises. *See id.* ¶¶ 57–70. Defendants claim that these allegations of economic harm fail because they assume cruise ships will pass the Act 96 surcharge onto their customers instead of absorbing the tax. *See* ECF No. 53 at 23; ECF No. 59 at 14–15.

Without saying so explicitly, Defendants are referring to courts' general "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"—here, the cruise ship companies and their passengers. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). And it's true that "[w]hen the plaintiff is not the object of a government regulation," as is the case for the Local Business Plaintiffs, "causation and redressability often depend on how regulated third parties . . . will act in response to the government regulation or judicial relief." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025) (citing *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024)). When plaintiffs rely on predictable behavior by other actors, they can usually establish standing. *See Dept. of Com. v. New York*, 588 U.S. 752, 768 (2019); *see also Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (commenting that for standing purposes, "[a] causation chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible" (internal quotation marks, citation, and alteration omitted)).

18

At the pleading stage, the Court concludes that the Local Business Plaintiffs'
assumptions about the economic effects of Act 96 fall into the predictable rather
than the speculative category.  Plaintiffs allege that state officials have estimated
that 99% percent of the newly-imposed tax will be passed along to passengers in
the form of higher prices, *see* ECF No. 1 ¶ 31, and that Act 96 may lead to fewer
cruises, *see id.* ¶ 56.  Further, it's at least plausible that businesses pass higher costs
on to customers.[6]  And it's not speculative that higher costs for passengers might
depress cruise business and on-shore spending.  *See Diamond Alt. Energy*, 606
U.S. at 120 (applying commonsense economic principles to conclude oil and gas
producers downstream of car manufacturers had Article III standing regarding
emission regulations); *see also California v. Azar*, 911 F.3d 558, 571–72 (9th Cir.
2018).

Defendants' reliance on the pre-enforcement standing limitation also fails to
persuade the Court.  Because the Local Business Plaintiffs' standing theory
depends on the predictable actions of the cruise lines and their passengers, and
there's no doubt that Act 96 will be enforced against the cruise lines, the Court
declines to find a lack of pre-enforcement standing.  *See Dept. of Com.*, 588 U.S. at
768 (allowing pre-enforcement challenge to citizenship question on census and

---

[6] At least one of CLIA's members is already passing Act 96's charges on to
consumers and seeing reduced demand.  *See* ECF No. 79-1 ¶¶ 8–9.

finding that states had standing even though their theory depended on people shirking their legal duty to respond to the census).

In sum, while the Court recognizes that economics is not as simple as described herein—and that many other factors could influence cruise ship demand and passenger spending—for the purposes of surviving the Motion to Dismiss, the Local Business Plaintiffs have sufficiently established Article III standing. The Court thus proceeds to the prudential standing concerns.

## 2.  Third-Party Standing

A party may have constitutional standing but still not be "entitled to have a federal court resolve [its] grievance," because of prudential standing concerns. *See Kowalski v. Tesmer*, 543 U.S. 125, 128–29 (2004).  Defendants argue that, even if the Local Business Plaintiffs have Article III standing, they do not enjoy prudential standing because they are proffering a failed third-party standing theory.  ECF No. 53 at 25–26.  As mentioned above, under the prudential doctrine of third-party standing, a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties," except in limited circumstances.  *Warth*, 422 U.S. at 499.  To determine if a party is asserting another person's rights, courts must consider whether the "constitutional or statutory provision on which the claim rests properly can be

understood as granting persons in the plaintiff's position a right to judicial relief."
*Id.* at 500.

But the Local Business Plaintiffs don't argue that they are asserting another's right—rather, they say they bring suit to protect their own rights and so contend that there is no need to consider prudential standing.[7]  *See* ECF No. 56 at 21–22.  Defendants respond that the Local Business Plaintiffs are "classic third-parties" that raise "the rights of proprietors of affected cruise ships[.]"  *See* ECF No. 53 at 25–26.

As described in the Article III analysis, it's clear that the Local Business Plaintiffs allege their own *harms*, but the question is whether they rest their claims on the legal *rights* of the cruise lines that operate in Hawai'i.  *See Kowalski*, 543 U.S. at 128–29 (citing *Warth*, 422 U.S. at 498).  So, whose rights are the Local Business Plaintiffs trying to vindicate with their claims that Act 96 violates the Tonnage Clause, and that the RHA preempts Hawaii's new law?  To answer the

---

[7] The Local Business Plaintiffs wisely don't argue that they meet the elements of successful third-party standing.  If a plaintiff is asserting a third party's right, the plaintiff may only maintain suit if the plaintiff establishes: (1) an injury-in-fact; (2) a close relationship to the third party; and (3) a hindrance to that third party's ability to protect its own interests.  *See Coal. of Clergy, Lawyers, and Professors v. Bush*, 310 F.3d 1153, 1163 (9th Cir. 2002) (listing requirements for third-party standing).

question, the Court examines the laws to determine what rights they articulate and who holds those rights.  The Court first notes that neither the Local Business Plaintiffs nor Defendants distinguishes the RHA from the Tonnage Clause for the purposes of determining standing, likely because the Ninth Circuit has determined that they enshrine the same rights.  *See Lil' Man in the Boat, Inc. v. City and Cnty. of San Francisco*, 5 F.4th 952, 957 (9th Cir. 2021) ("As several courts have observed, the 2002 amendment codified Commerce Clause and Tonnage Clause common law.").  Regardless, the Court concludes that the Local Business Plaintiffs do not assert their own rights in their Tonnage Clause and RHA challenges.

The general understanding of the Tonnage Clause is that it supplements the Constitution's restriction on states' "power to lay duties on imports or exports" and provides that "[n]o State shall, without the Consent of Congress, lay any Duty of Tonnage."  *Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n*, 296 U.S. 261, 265 (1935); U.S. Const. art. I, § 10, cl. 3.  Its purpose therefore "mirrors the intent of other constitutional provisions" that "seek to restrain the states themselves" from using "the taxing power injuriously to the interests of" other states.  *See Polar Tankers, Inc. v. City of Valdez, Alaska*, 557 U.S. 1, 7–8 (2009) (internal quotation marks, citation, and alteration omitted).  "So understood, the Tonnage Clause is a limitation on state power over foreign and interstate commerce."  Erik M. Jensen, *Quirky Constitutional Provisions Matter: The*

22

*Tonnage Clause, Polar Tankers, and State Taxation of Commerce*, 18 Geo. Mason L. Rev. 669, 669, 716 (2011).  In other words, the Tonnage Clause protects federal supremacy over matters of maritime commerce and attempts to maintain balance among the various states.

The RHA, meanwhile, protects similar interests.  The Ninth Circuit remarked that the statute was intended to prevent non-federal actors from imposing tolls on vessels and thus generally protects the "free movement of commerce," which alone says little about who may assert any infringement of that purpose.  *See Lil' Man in the Boat*, 5 F.4th at 961.  Nevertheless, the Ninth Circuit concluded that the statute doesn't afford a private right of action in part because the RHA "is the kind of general ban that carries no implied intent to confer rights on a particular class of persons."  *Id.* at 960.

The Tonnage Clause and the RHA therefore protect a broad interest in free movement of ships and, thus, interstate commerce.  The Federal Government's ability to defend such a right is self-evident.  And, while there's no dispute that a ship's operator may also assert this right and challenge a charge as a violation of the Tonnage Clause, *see*, *e.g.*, *Polar Tankers*, 557 U.S. at 5 (ship owner plaintiff); *Lil' Man in the Boat*, 5 F.4th at 962 (noting that commercial charter business plaintiff could bring Tonnage Clause claim); *Clyde Mallory Lines*, 296 U.S. at 263 (ship operator plaintiff), the prospect of extending that right to anyone arguably

23

affected by maritime commerce is more dubious.  Likewise, the fact that there is

no private right of action to sue for damages under the RHA, casts further doubt on

the idea that non-vessel-related businesses possess any rights under the statute.

At least one Circuit has considered third-party standing in a Tonnage Clause

case, concluding that a land-based business could not maintain its challenge.  In

*Maher Terminals, LLC v. Port Authority of New York and New Jersey*, 805 F.3d

98, 102 (3d Cir. 2015), the Third Circuit affirmed the district court's dismissal of

"a landside marine terminal operator['s]" Tonnage Clause challenge to the rent it

paid the Port Authority.  *See id.* at 102.  While the Third Circuit framed much of its

discussion within the "zone of interests" test framework, which is now understood

as applicable when the plaintiff invokes a statutory cause of action, *see FDA v. R.J.

Reynolds Vapor Co.*, 606 U.S. 226, 232 (2025), it also addressed whether the non-

vessel-owner plaintiff was asserting a third parties' rights.  *See Maher Terminals*,

805 F.3d at 108–09.  The court concluded that "the Tonnage Clause is not

concerned with taxes on any entity that has *some* relationship with vessels; rather,

it prohibits taxes that are directed at vessels or their representatives."  *Id.* at 108

(emphasis added).  In other words, the Tonnage Clause protects vessels and their

owners or operators, not just anyone who relies on the business of ships.  And so

the Third Circuit rejected the plaintiff's argument that it could assert a Tonnage

Clause claim because the provision protected commerce more broadly. *See id.* at

109–110.

Still, the Local Business Plaintiffs contend that they have the right to bring

challenges under "structural constitutional provisions—like the Tonnage Clause—

because those provisions 'protect[] individual liberty.'" ECF No. 56 at 21 (quoting

*Bond v. United States*, 564 U.S. 211, 223 (2011)). But their citation to *Bond* is

inapposite as that case involved a criminal defendant indicted for violating a

federal statute who challenged the law as abrogating the Tenth Amendment's

protection of state authority. *See Bond*, 564 U.S. at 214. *Bond* is easily

distinguishable for a few other reasons, but most significantly, the criminal

defendant in *Bond* was prosecuted under—i.e., was *subject* to—the federal statute

that she argued violated the Constitution. In other words, the criminal defendant in

*Bond* was more akin to CLIA and its members than the Local Business Plaintiffs.

Extending *Bond*'s rationale to the unregulated Local Business Plaintiffs to allow

them to assert broad commerce rights turns the matter into the type of

"'generalized grievance' shared in substantially equal measure by all or a large

class of citizens, that . . . alone normally does not warrant exercise of jurisdiction."

*Warth*, 422 U.S. at 499 (citations omitted).

*Warth* itself is a better analogue to the instant case. In *Warth*, a group of

taxpayer plaintiffs from Rochester sought to challenge neighboring "Penfield's

allegedly discriminatory and exclusionary zoning practices." *Id.* at 508.  They

claimed that the zoning practices forced Rochester to provide more housing and

consequently increased the plaintiffs' municipal tax burden.  *See id.* at 508–09.

Assuming the plaintiffs had Article III standing, the Supreme Court nonetheless

found they ran afoul of the prudential standing requirement that they assert their

own rights:

> Petitioners do not, even if they could, assert any personal right
> under the Constitution or any statute to be free of action by a
> neighboring municipality that may have some incidental adverse
> effect on Rochester.  On the contrary, the only basis of the
> taxpayer-petitioners' claim is that Penfield's zoning ordinance
> and practices violate the constitutional and statutory rights of
> third parties, namely, persons of low and moderate income who
> are said to be excluded from Penfield.  In short the claim of these
> petitioners falls squarely within the prudential standing rule that
> normally bars litigants from asserting the rights or legal interests
> of others in order to obtain relief from injury to themselves.

*Id.* at 509.

Applying caselaw and logic, the Court concludes that the Local Business

Plaintiffs assert the rights of third parties and thus lack prudential standing.  The

Court GRANTS Defendants' Motion to Dismiss as to the Local Business

Plaintiffs.  The Court dismisses the Local Business Plaintiffs' claims without

prejudice, but also without leave to amend because there is no set of facts that the

Local Business Plaintiffs could allege that would change their position vis-à-vis the

Tonnage Clause and the RHA.

26

### iii.    Federal Government

In a related vein, Defendants also argue that the Federal PI Motion should be denied because the Federal Government lacks standing.  *See* ECF No. 98 at 24–26. Specifically, they claim the Federal Government has not suffered any concrete harm.  *See id.*  But the Federal Government has an interest in enforcing its statutes and maintaining federal supremacy.  *See United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (affirming finding of irreparable harm where United States argued that federal law preempted state legislation), *rev'd in part on other grounds*, 567 U.S. 387 (2012); *United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."); *United States v. Alaska*, 608 F. Supp. 3d 802, 809 (D. Alaska 2022) ("Here, irreparable harm would necessarily result from the enforcement of a State emergency order that is likely preempted and in violation of the Supremacy Clause.").  As discussed above, both the RHA and the Tonnage Clause assert federal supremacy over interstate maritime commerce.  The Federal Government may bring suit to protect that interest.  *Cf. United States v. Texas*, 566 F. Supp. 3d 605, 640–42 (W.D. Tex. 2021) (explaining that interest in interstate commerce can support the United States' standing).

### b.    Tax Injunction Act

While CLIA survives Defendants' attack on standing, Defendants also move to dismiss CLIA's claims for lack of jurisdiction under the Tax Injunction Act and argue that the Federal Government is not entitled to a preliminary injunction based on the same.  ECF No. 53 at 15; ECF No. 98 at 8.  The Tax Injunction Act declares that district courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341.  CLIA argues that Hawaiʻi does not offer a speedy or efficient mechanism for challenging Act 96's taxes and provides no remedy at all as to the Registration Fee and Notice Requirements.  ECF No. 56 at 12.  The Federal Government contends that the Tax Injunction Act does not apply to suits where the United States is a party.  ECF No. 97-1 at 18–23.

The Court begins with an overview of the state mechanisms by which CLIA could seek review of the State Tax and County Surcharges, and then turns to the various arguments regarding whether those avenues are plain, speedy, and efficient.  Ultimately, the Court concludes that Hawaii's remedies to challenge the transient accommodations tax are sufficient and that the Court thus lacks jurisdiction over CLIA's claims relating to the State Tax and County Surcharges under the Tax Injunction Act.  Further, although the Registration Fee and Notice

Requirements likely fall outside the Tax Injunction Act, the Court nonetheless considers whether the principle of comity dictates that the Court decline jurisdiction, and concludes that it does not.

The analysis is different as to the Federal Government because it is not a taxpayer. While the Court need not go so far as to say that the Tax Injunction Act never applies to the Federal Government, here, because Hawai'i does not offer non-taxpayers a route to challenge the state's taxes, the Court determines that the Federal Government's claims are not barred by the Tax Injunction Act.

### i.    Hawaii's Statutory Tax Framework

Although Hawai'i state courts may not enter declaratory relief "in any controversy with respect to taxes," HRS § 632-1(a), the State offers taxpayers two mechanisms to challenge taxes. *See Air Polynesia, Inc. v. Freitas*, 742 F.2d 546, 548 (9th Cir. 1984). As to the State Tax, CLIA's members may either: (1) seek a refund of taxes paid and appeal any denial or failure to act on a refund request, *see* HRS §§ 232-14.5, 237D-10; or (2) withhold payment of the tax until it receives an assessment and then appeal the assessment, *see id.* §§ 237D-11, 235-114. The tax appeal court "shall determine all questions of fact and all questions of law, including constitutional questions, involved in the appeal," but its jurisdiction is "limited to the amount of valuation or taxes." *Id.* § 232-13. The taxpayer may appeal a decision by the tax appeal court to the state's intermediate appellate court

29

("ICA").  *See id.* § 232-19.  In the ICA, "[t]he appeal shall be considered and treated for all purposes as a general appeal and shall bring up for determination all questions of fact and all questions of law, including constitutional questions, involved in the appeal."  *Id.*; *see also* HRS § 602-57 (jurisdiction of intermediate appellate courts).  As discussed below, the Court finds both the assessment and refund methods to be plain, speedy, and efficient.

As to the County Surcharges, there's no dispute that each county also provides appeal rights via the assessment avenue.  *See* ECF No. 53 at 17; ECF No. 56 at 14 n.2; Haw. Cnty. Code § 2-265; Kaua'i Cnty. Code § 5-4.12; Maui Cnty. Code § 3.47.120; Rev. Ord. Hon. § 8A-1.16.  But the parties contest whether the county refund procedures provide for appeal to the tax appeal court.  *See* ECF No. 56 at 14 (citing ECF No. 1 ¶ 78 n.15); ECF No. 59 at 10–11.  Regardless, because of the presence of the counties' adequate assessment mechanisms for tax challenges, the potential lack of the additional refund avenue does not trigger the Tax Injunction Act's exception.

      *ii.*    *Plain, Speedy, Efficient Remedy for CLIA's State Tax and County Surcharges*

CLIA argues that both the assessment and refund routes are inadequate for the Tax Injunction Act's exception.  It claims that the assessment process isn't speedy, ECF No. 56 at 12–14, and that the refund avenue isn't efficient, *id.* at 14–15.  Defendants contest both lines of attack and say that the Ninth Circuit has

30

already validated Hawaii's review procedures.  ECF No. 53 at 17–18; ECF No. 59

at 9–14.  The Court concludes Hawai'i offers plain, speedy, and efficient avenues

for CLIA to challenge the State Tax and County Surcharges.

To effectuate the Tax Injunction Act's purpose to drastically limit "federal-

court interference with state tax systems," courts narrowly interpret the plain,

speedy, and efficient exception.  *Grace Brethren Church*, 457 U.S. at 413.  Indeed,

"[f]or the Act's jurisdictional prohibition to apply, the state court remedy need only

meet 'certain minimal *procedural* criteria.'"  *Lowe v. Washoe Cnty.*, 627 F.3d

1151, 1155 (9th Cir. 2010) (quoting *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503,

512 (1981)).  This means that a state-court remedy is sufficient under the Tax

Injunction Act so long as it "provides the taxpayer with a full hearing and judicial

determination at which she may raise any and all constitutional objections to the

tax."  *Rosewell*, 450 U.S. at 514 (internal quotation marks omitted).  "For a remedy

to be plain, the procedures available in state court must be certain."  *Hyatt v. Yee*,

871 F.3d 1067, 1073 (9th Cir. 2017) (internal quotation marks and citation

omitted).  "A remedy is speedy if it does not entail a significantly greater delay

than a corresponding federal procedure."  *Id.* (internal quotation marks and citation

omitted).  And "[a] remedy is efficient unless it imposes an unusual hardship

requiring ineffectual activity or an unnecessary expenditure of time or energy."  *Id.*

(internal quotation marks, citation, and alteration omitted).  When a state offers

two different routes for challenging a tax, only one needs to be plain, speedy, and efficient for the Tax Injunction Act's jurisdictional bar to apply. *See id.* at 1074–76.

As an initial matter, the Ninth Circuit has held that taxpayers have a plain, speedy, and efficient remedy in Hawaii's courts, either through the assessment or refund mechanisms. *See Air Polynesia*, 742 F.3d at 548–49. In *Air Polynesia*, the Ninth Circuit explained that pursuant to the assessment route, the state court could provide a full and fair hearing on the taxpayer's constitutional claims, even if the taxpayer's state court action ran afoul of the statute of limitations. The Ninth Circuit also concluded that the refund procedure was sufficient even if the taxpayer lacked the ability to pay the tax upfront. *See id.* But while *Air Polynesia* provides persuasive support for Defendants' Motion to Dismiss, it is not dispositive as the Court must also consider "whether the unique circumstances of this case have prevented a plain, speedy, and efficient remedy from being available here." *Hyatt*, 871 F.3d at 1074. Thus, the Court turns to CLIA's case-specific arguments.

CLIA first claims that pursuing the assessment method would not be speedy. Specifically, it notes that its members' first annual tax returns under Act 96 will not be due until April 2027, ECF No. 1 ¶ 77; HRS § 237D-7, and that the State need not assess the taxes for the first year until three years after the filing of those initial returns. *See* ECF No. 56 at 13 (citing HRS § 237D-9). CLIA thus argues

32

that its members may not be able to begin their challenges to Act 96 until April

2030, more than four years after they start paying.  *See* ECF No. 56 at 13.

Defendants respond that CLIA's estimate is the absolute limit on when the

State would issue an assessment, and the State may issue an assessment much

sooner than April 2030.  *See* ECF No. 59 at 12; HRS § 237D-9(c) ("[T]he amount

of taxes imposed by this chapter shall be assessed or levied within three years after

the annual return was filed[.]").  Regardless, even assuming  CLIA's members

could not challenge the tax until 2030, the Court concludes that such timing would

not trigger the Tax Injunction Act exception.

CLIA cites *Rosewell* for the premise that the Court should find the *possible*

four-plus year delay not speedy.  In *Rosewell*, the Supreme Court considered

Illinois' tax remedy scheme whereby property owners contesting taxes eventually

had to pay the assessed amount under protest and then seek a refund.  *See*

*Rosewell*, 450 U.S. at 505–10.  While the Supreme Court appeared concerned

about Illinois' standard two-year delay between payment and refund, it also

expressed general frustration about the pace of litigation in the 20th century, and

ultimately concluded that the two-year wait was comparable to the time it would

take for federal resolution of the plaintiff's claims.  *See id.* at 518–21.  In doing so,

it commented that state remedies need not be "the speediest."  *Id.* at 520.

From this, CLIA emphasizes a comment in the *Rosewell* concurrence that the Illinois remedy "perhaps only barely" qualifies as plain, speedy, and efficient. *See* ECF No. 56 at 13; *Rosewell*, 450 U.S. at 529 (Blackmun, J., concurring). But *Rosewell* did not set a time limit under the Tax Injunction Act, and even the two-year delay there isn't an apt comparison because that delay there was *after* earlier state administrative appeals. *See Rosewell*, 450 U.S. at 508.

Further, CLIA fails to cite any case in which a court found a four-year state procedure not speedy. By contrast, Defendants' citations and the Court's research suggest that even a four-year delay—which, again, is the outer limit on when an assessment would be issued—would not implicate the Tax Injunction Act's exception. *See Long Island Lighting Co. v. Town of Brookhaven*, 889 F.2d 428 (2d Cir. 1989) (ten years); *Glob. Leadership Found. v. City of New York*, 2023 WL 3144043, at *1 (2d Cir. 2023) (over four years); *Pac. Bells, LLC v. Inslee*, 600 F. Supp. 3d 1149, 1162–64 (W.D. Wash. 2022) (rejecting argument that Washington remedy was not speedy where the plaintiffs could not begin a challenge for over a year and could not appeal for over four years); *see also Lerch v. Cascade Cnty. Treasurer*, 12 F.3d 1107 (9th Cir. 1993) (unpublished) (three years). In sum, the Court concludes that Hawaii's assessment method for challenging taxes provides a speedy remedy.

As to the refund method for challenging Act 96's taxes, CLIA argues it does not provide an efficient remedy because its members will need to file a multiplicity of identical refund actions.  ECF No. 56 at 14–15; ECF No. 1 ¶ 79.  Specifically, CLIA—assuming the counties provide a refund mechanism—asserts that its members will have to file as many as five refund actions per month to "preserve" their challenges to the State Tax and County Surcharges.  *See id.*  But CLIA offers no support for the statement that such monthly actions would be necessary to preserve their challenges.  And as Defendants point out, a member could instead just file a refund action related to its yearly return.  *See* HRS § 237D-10; *id.* § 232-14.5.  Alternatively, one of CLIA's members could initiate a refund action relating to the first month of the State Tax it pays.  *Cf. Air Polynesia*, 742 F.2d at 548 (noting that challenger could pay tax assessment for any one disputed year and still contest the rest).  If the state court eventually concluded that the State Tax violates the Tonnage Clause or RHA, the member could then file refund actions on its yearly returns.  *See Grace Brethren Church*, 457 U.S. at 415–16 (commenting "state taxing authorities can be expected to respect that [state] court's [constitutional] holding in future administrative proceedings.").  As such, CLIA's hypothetical inefficiency would be self-inflicted, and does not remove the instant case from the purview of the Tax Injunction Act.

The Court thus concludes that the assessment and refund methods both present plain, speedy, and efficient mechanisms to challenge the State Tax. Further, there is no dispute that CLIA's members may challenge the County Surcharges via appeals of assessment, meaning there is at least one adequate avenue to challenge the taxes. Because Hawaiʻi provides these mechanisms for review, this Court lacks jurisdiction under the Tax Injunction Act to grant the relief CLIA seeks as to the State Tax and County Surcharge portions of Act 96. The Court therefore GRANTS the Motion to Dismiss as to CLIA's claims tied to the State Tax and County Surcharges.

### iii.    Federal Government

Defendants argue that the Tax Injunction Act also prevents the Federal Government from challenging Act 96, *see* ECF No. 98 at 8–16, while the Federal Government primarily contends that when it's a party to a lawsuit, the Tax Injunction Act does not apply, *see* ECF No. 97-1 at 18. The Court addresses the Federal Government's main argument for context, but finds that the Tax Injunction Act does not apply for the alternative reason that as a non-taxpayer, the Federal Government does not have a plain, speedy, and efficient remedy to challenge the State Tax and County Surcharges under Hawaiʻi law.

As an initial matter, this Circuit has never explicitly answered the question of whether the Federal Government is per se exempt from the Tax Injunction Act.

36

The Federal Government argues that it is, citing to *Arkansas v. Farm Credit Services of Central Arkansas*, 520 U.S. 821 (1997), and the more general principle that the "Government is not bound by its own legislative restrictions on the exercise of remedial rights unless the intent to bind it is express." *Id.* at 827 (citations omitted).  It heavily relies on a portion of one sentence that reads, "the Tax Injunction Act is inapplicable where the United States is a party[.]"  *See* ECF No. 97-1 at 18 (quoting *Arkansas,* 520 U.S. at 829).  But the Federal Government overstates the scope of the Supreme Court's opinion in *Arkansas*.

Throughout *Arkansas*, the Supreme Court reiterates the more qualified proposition that "the Tax Injunction Act is not a constraint on federal judicial power *when the United States sues to protect itself and its instrumentalities from state taxation*."  *See*, *e.g.*, *Arkansas*, 520 U.S. at 827 (emphasis added).  *Arkansas*' holding moreover merely concluded that when an instrumentality of the United States wants to avoid the Tax Injunction Act, the Federal Government must be a co-plaintiff in the case.  *See id.*

Defendants point to *United States v. Cnty. of Nassau*, 79 F. Supp. 2d 190, 193 (E.D.N.Y. 2000), to argue that the Federal Government is not categorically exempt from the Tax Injunction Act.  *See* ECF No. 98 at 11.  There, the court concluded that the Federal Government could not evade the Tax Injunction Act simply by asserting a federal interest in the case.  *See id.*  But, as the Federal

Government persuasively argues, *Nassau* failed to confront the idea that Congress must speak clearly when restricting the government's jurisdiction.  *See* ECF No. 97-1 at 21; *cf. United States v. Bureau of Revenue of State of New Mexico*, 291 F.2d 677, 679 (10th Cir. 1961) ("Application of the established rule that the sovereign is not bound by its legislative restrictions against the exercise of remedial rights unless such an intent is clearly expressed, buttressed by a consideration of the legislative history of the [Tax Injunction] Act, has persuaded uniform decision that it was not intended to apply to the United States.").

The Court declines to decide whether the Tax Injunction Act ever applies to the United States, and is instead more easily persuaded by the Federal Government's argument that, because it is not subject to Act 96's taxes and fees, it cannot rely on the Hawaii's remedial scheme to challenge the law and is barred from bringing suit in state court under HRS § 632-1(a).  *See* ECF No. 97-1 at 23. The Local Business Plaintiffs made a similar argument and cited *Capitol Industries-EMI, Inc. v. Bennett*, 681 F.2d 1107 (9th Cir. 1982), for the premise that when non-taxpayers cannot challenge taxes through a state's mechanisms, the Tax Injunction Act does not apply to their case.  *See* ECF No. 56 at 10–11.  That is the scenario here because—as defense counsel conceded at the December 17 hearing—Hawaiʻi law forecloses a challenge to a state tax from a non-taxpayer. *See Capitol Industries-EMI*, 681 F.2d at 1119 ("A nontaxpayer that has stated a

claim with respect to an assessment or collection is entitled to a judicial remedy in which they can participate as a party.").

In sum, the Court concludes that the Tax Injunction Act bars CLIA's claims as to the State Tax and County Surcharges but that the Tax Injunction Act does not apply to the Federal Government in this instance. The Court now turns to CLIA's challenges to the Registration Fee and Notice Requirements.

### c.    *Comity*

Recognizing that CLIA's claims against the Registration Fee and Notice Requirements may not fall within the Tax Injunction Act's scope, Defendants argue that this Court should nonetheless decline jurisdiction over those claims pursuant to the doctrine of comity. *See* ECF No. 53 at 19–21 (noting that Registration Fee may not "technically fit" within Tax Injunction Act); *see also Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1 (2015). Defendants also contend that comity affects the Federal Government's claims and renders an injunction inappropriate. *See* ECF No. 98 at 16.

"The comity doctrine counsels lower federal courts to resist engagement in certain cases falling within their jurisdiction," and "has particular force when [those courts] are asked to pass on the constitutionality of state taxation of commercial activity." *Levin v. Com. Energy, Inc.*, 560 U.S. 413, 421 (2010). In this context, the doctrine is "[m]ore embracive than the [Tax Injunction Act]" and

39

applies when: (1) the plaintiff's claims "risk disrupting state tax administration,"
and (2) there is an adequate state-court forum for the claims. *See id.* at 417, 422,
424.

Although the Supreme Court has not precisely defined what activities "risk
disrupting state tax administration," the phrase clearly means something broader
than the Tax Injunction Act. For example, the doctrine of comity may counsel
against federal court jurisdiction where a claim would affect the state taxation
process but does not halt the three "discrete phases" that the Tax Injunction Act
targets: assessment, levy, or collection. *See Direct Mktg. Ass'n*, 575 U.S. at 8; *see
also id.* at 15 (concluding that the Tax Injunction act did not bar a challenge to
Colorado's notice requirements related to taxes but leaving the comity question
open).

As to the adequacy of the state remedies for the purpose of comity, there is
"no significant difference . . . between remedies which are 'plain, adequate, and
complete,' as that phrase has been used in articulating the doctrine of equitable
restraint, and those which are 'plain, speedy and efficient,' within the meaning" of
the Tax Injunction Act. *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454
U.S. 100, 116 n.8 (1981).

Ultimately, the Court concludes that comity does not warrant dismissal of
CLIA's claims because of a lack of certainty about whether Hawaiʻi provides an

40

adequate state remedy.  For the same reason, comity does not diminish the Federal

Government's likelihood of success in its Federal PI Motion.

### i.    Disruption of State Tax Administration

CLIA argues that its "First Amendment claim does not risk disrupting state

tax administration, because it seeks only to enjoin Act 96's notice and disclosure

requirements."  *See* ECF No. 56 at 18 (internal quotation marks and citation

omitted).  CLIA's allegation that the Notice Requirements violate the First

Amendment derives entirely from CLIA's Tonnage Clause challenge:  it contends

that because Act 96 violates the Tonnage Clause, the Notice Requirements

constitute impermissible compelled speech.[8]  *See* ECF No. 1 ¶ 113; ECF No. 56 at

29–30; ECF No. 28-1 at 19 ("For present purposes, CLIA acknowledges that if the

underlying regime of cruise-ship surcharges were constitutional, the notice and

disclosure requirements likely would be constitutional as well because they are

related to that regime.").  As such, CLIA's First Amendment claim is a collateral

challenge to the constitutionality of Act 96's taxes and fees.  Put differently, to rule

in favor of CLIA on its First Amendment claim, this federal court would need to

---

[8]  "The government may compel truthful disclosure in commercial speech as long
as the compelled disclosure is 'reasonably related' to a substantial governmental
interest."  *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 755
(9th Cir. 2019) (en banc) (citation omitted) (internal quotation marks, citation, and
alteration omitted).

conclude and declare that Act 96's State Tax and County Surcharges violate the Tonnage Clause—the exact result that the Tax Injunction Act and comity are supposed to prevent. Thus, because the CLIA's First Amendment claim is inextricably intertwined with its challenge to the State Tax and County Surcharges, the relief CLIA seeks risks disrupting Hawaii's tax administration and implicates comity. *See Thorp v. Dist. of Colum.*, 317 F. Supp. 3d 74, 82–83 (D.D.C. 2018) (concluding that, while Plaintiff's "inextricably intertwined claims . . . may not invoke the jurisdictional bar of the [Tax Injunction Act] , resolving this case would require this Court to delve into sensitive matters of state tax law").

As to the Registration Fee, CLIA does not dispute that enjoining it would (at least) risk disrupting the State Tax and County Surcharges. *See* ECF No. 56 at 17–18 (arguing that the Notice Requirements claim would not disrupt state tax administration and that the other claims are barred for lack of an adequate remedy). And, in any event, the Registration Fee claim bears on state tax administration because it is a "condition precedent" to offering transient accommodations, and

thus a necessary step in the State's eventual assessment of the transient

accommodations tax.  *See* HRS § 237D-4(a).[9]

As such, the Court concludes that the first condition of dismissing on comity

grounds is met because CLIA's challenges risk disrupting Hawaii's tax

administration.

### ii.    Adequate State Remedy

Thus, the question is whether Hawaiʻi offers an adequate remedy for CLIA's

Registration Fee and Notice Requirements claims.  In their initial briefing, CLIA

argued that there was no state mechanism to recover the Registration Fee after it

was paid, ECF No. 56 at 15–15, and that the tax appeal court did not have

jurisdiction to enjoin the Notice Requirements, *id.* at 17 n.3.  Defendants offered

little if any response to the contention except to say that "Plaintiffs should not be

allowed to engage in 'artful pleader' to circumvent the Tax Injunction Act."  ECF

No. 59 at 17.  Even if CLIA engaged in clever pleading though, Defendants may

only rely on the comity doctrine to dismiss the Registration Fee and Notice

Requirements claims if Hawaiʻi offers an adequate means to challenge those

---

[9]  The Court also notes that fees—like taxes—raise comity concerns because they
affect local revenue generation.  *See Homewood Vill., LLC v. Unified Gov't of
Athens–Clarke Cnty.*, 2016 WL 1306554, at *3 (M.D. Ga. Apr. 1, 2016), *aff'd sub
nom. Homewood Vill. LLC v. Unified Gov't of Athens–Clarke Cnty.*, 677 F. App'x
623 (11th Cir. 2017) (rejecting argument that comity concerns do not arise in
challenges to fees); *see also Boise Artesian Hot & Cold Water Co. v. Boise City*,
213 U.S. 276, 282–87 (1909) (discussing challenge to city licensing scheme).

requirements of Act 96.  Because the Court concludes there is uncertainty on the

matter, it declines to dismiss the claims on comity grounds as the possible state

court remedies are not "plain."  *See Hyatt*, 871 F.3d at 1073 (9th Cir. 2017) ("For a

remedy to be 'plain,' 'the procedures available in state court must be certain.'"

(citation omitted)).

     To start, it is unclear whether the tax appeal court may hear CLIA's

Registration Fee and Notice Requirements claims.  This stems from the fact that

while the tax appeal court must determine "all questions of law, including

constitutional questions, involved in the appeal," its jurisdiction is "limited *to the*

*amount of valuation or taxes*[.]"  HRS § 232-13 (emphasis added).  CLIA's claim

that the Notice Requirement violates the First Amendment does not directly

implicate the amount or valuation of taxes.  *See* ECF No. 1 ¶ 113.  And as to the

Registration Fee, Defendants effectively conceded at the hearing that it doesn't

constitute a tax.  ECF No. 75 at 30:23–24.

     After the hearing on the Private PI Motion and Motion to Dismiss, the Court

ordered the parties to file supplemental briefing regarding whether Hawaii's bar on

declaratory relief actions in matters related to tax applied to Plaintiffs' claims

about the Registration Fee and Notice Requirements.  *See* ECF No. 73 (citing HRS

§ 632-1(a), Hawaii's prohibition on declaratory relief in tax actions).  Defendants'

supplemental briefing, however, failed to convince the Court that Plaintiffs possess

a plain, speedy, and efficient remedy to challenge the Registration Fee and Notice

Requirements of Act 96.

Regarding both the Notice Requirements and the Registration Fee,

Defendants agree that HRS § 632-1(a) prevents a declaratory relief action in state

courts at least *at present*. *Compare* ECF No. 76 at 3–5 (State Defendants arguing

that HRS § 632-1(a) bars challenges), *with* ECF No. 77 at 4–5 (County Defendants

arguing that HRS § 632-1(a) currently bars challenges, but wouldn't after the Tax

Appeals Court rules on the legality of the State Tax and County Surcharges).

Thus, this Court is the only venue where CLIA can obtain a decision on the

constitutionality of the Notice Requirements and Registration Fee before they take

effect, which counsels against applying comity to dismiss the claims. *See* ECF No.

84 at 4.

Yet, despite not identifying any state remedy in the initial briefing on the

Private PI Motion and Motion to Dismiss, Defendants now raise a new possible

mechanism to challenge the $15 Registration Fee in their supplemental briefing.

They argue that CLIA's members could pay the Registration Fee under protest and

then bring an action to recover the fee under HRS § 40-35.  ECF No. 76 at 5; ECF

No. 77 at 5–6.  CLIA responds that Defendants' failure to mention HRS § 40-35

previously suggests that such relief is not "plainly available," and that in any event,

Hawai'i law requires a formal administrative decision before a party can bring suit

45

under the statute.  ECF No. 84 at 5 (citing *Hawaiian Airlines, Inc. v. Dep't of Tax'n*, 155 Haw. 197, 212, 559 P.3d 283, 298 (2024)).

CLIA is correct that a party that wishes to institute a suit under HRS § 40-35 must first receive a formal administrative decision from the State.  *See Grace Bus. Dev. Corp. v. Kamikawa*, 92 Hawai'i 608, 612, 994 P.2d 540, 544 (2000).  That fact alone wouldn't render HRS § 40-35 inadequate, but *how* a cruise line would practically receive such a decision in this context appears uncertain, particularly where the State never answers that question.

As HRS § 237D-4(a) states, a business must pay the Registration Fee as a "condition precedent to engaging or continuing in the business of furnishing transient accommodations."  After the business pays the fee, it receives a registration certificate, which it must then conspicuously post.  *Id.* § 237D-4(b).  If it doesn't post the registration certificate, it may become liable for increasingly severe daily fines.  *See id.*  So, as of January 1, 2026, CLIA's members must either pay the Registration Fee or face increasing fines.  If the members simply pay the Registration Fee, there would be no obvious occasion for the State to issue any formal administrative decision.  As the Hawai'i Supreme Court has made clear, some abstract protest to a fee paid does not provide the tax appeal court with jurisdiction.  *Grace Bus. Dev. Corp.*, 92 Hawai'i at 612, 994 P.2d at 544; *Hawaiian Airlines*, 155 Hawai'i at 215, 559 P.3d at 301.  Because of the lack of a clear

46

refund procedure for non-taxes like the Registration Fee, and the fact that the fee is a condition precedent to the business of the cruise lines, the Court is not convinced that HRS § 40-35 offers an adequate remedy. Thus, comity does not bar CLIA's or the Federal Government's claims related to the Registration Fee. The Court therefore DENIES the Motion to Dismiss CLIA's claims tied to the Notice Requirements and Registration Fee, at least with regard to the State Defendants. The viability of such claims against the County Defendants is further discussed immediately below.

## B.    Sufficiency of Claims

Apart from their jurisdictional challenges, Defendants also move to dismiss Private Plaintiffs' Complaint under Rule 12(b)(6). Because the Court dismissed CLIA's State Tax and County Surcharges claims under the Tax Injunction Act, and dismissed all of the Local Business Plaintiffs' claims, all that remains to consider under Rule 12(b)(6) are CLIA's challenges to the Registration Fee and Notice Requirements. Defendants move to dismiss these remaining claims on the basis that the Registration Fee is "unrelated to the privilege of entering, trading in, or lying in a port," ECF No. 53 at 30 n.6, the RHA does not provide a private right of action, *see id.* at 28–29, and because Act 96 does not violate the Tonnage Clause, the Notice Requirements do not run afoul of the First Amendment, *id.* at 31. Finally, Defendants move to dismiss some of the remaining claims against some of

47

the Defendants as redundant or unrelated to the parties' duties. *See id.* at 31–32.

The Court GRANTS the Motion to Dismiss as to the Registration Fee and Notice

Requirement claims against the County Defendants but otherwise DENIES those

claims against the State Defendants.

### 1. Legal Standard

Rule 12(b)(6) permits a motion to dismiss for "failure to state a claim upon

which relief can be granted." Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) dismissal

is proper when there is either a "lack of a cognizable legal theory or the absence of

sufficient facts alleged." *UMG Recordings, Inc. v. Shelter Cap. Partners, LLC*,

718 F.3d 1006, 1014 (9th Cir. 2013) (quoting *Balistreri v. Pacifica Police Dep't*,

901 F.2d 696, 699 (9th Cir. 1988)). Under Rule 12(b)(6), the court accepts as true

the material facts alleged in the complaint and construes them in the light most

favorable to the nonmovant. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38

(9th Cir. 1996).

But the Court is not "bound to accept as true a legal conclusion couched as a

factual allegation," and "[a] pleading that offers 'labels and conclusions' or 'a

formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]'

devoid of 'further factual enhancement.'" *Id.* (quoting and altering *Twombly*, 550

U.S. at 557). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" whereby the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570, in relation to the "short and plain" fact-pleading standard required by Rule 8(a)(2)).

### 2.    Analysis

The Court will discuss the Tonnage Clause claims more thoroughly below in connection with the motions for preliminary injunction, but concludes that CLIA has at least sufficiently pleaded that the $15 Registration Fee acts as a charge for entering, trading in, or lying in Hawaii's ports in violation of the Tonnage Clause. *See Clyde Mallory Lines*, 296 U.S. at 265–66 ("[T]he prohibition against tonnage duties has been deemed to embrace all taxes and duties regardless of their name or form[.]"). The Court thus DENIES the Motion to Dismiss on this ground.

Because Plaintiffs have sufficiently alleged a violation of the Tonnage Clause, the Court also DENIES the Motion to Dismiss as to the First Amendment challenge to the Notice Requirements. If Act 96's charges are indeed violations of the Constitution or the RHA, CLIA plausibly alleges that the Notice Requirements constitute impermissible compelled speech because there is no substantial interest in compelling speech related to an unconstitutional law. *See Am. Beverage Ass'n*, 916 F.3d at 756 (discussing test for compelled commercial speech).

49

As to the RHA, Defendants primarily argue that because there is no private right of action under the statute, *see Lil' Man in the Boat*, 5 F.4th at 963, CLIA's claim must be dismissed.  ECF No. 53 at 28–29.  CLIA responds that *Lil' Man in the Boat* doesn't apply because, unlike the plaintiff there, CLIA doesn't assert an RHA claim for damages under 42 U.S.C. § 1983.  ECF No. 56 at 28–29.  CLIA instead alleges that the RHA preempts Act 96's charges and asks the Court to rely on its injunctive power under *Ex parte Young*, 209 U.S. 123 (1908), to grant relief.  ECF No. 37 ¶¶ 23, 98; ECF No. 56 at 29.  The Court concludes CLIA has the better argument.

As courts "have long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) (citing *Ex parte Young*, 209 U.S. at 155–56); *see also Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 144–45 (2d Cir. 2016) (summarizing doctrine of equity jurisdiction to enjoin preempted laws under *Ex parte Young*).  This power is not unlimited though:  while *Ex parte Young* "permits courts of equity to enjoin enforcement of state statutes that violate the Constitution or conflict with other federal laws," Congress can still restrict such private enforcement.  *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018).  Congress does so by "enact[ing] statutes with a

50

detailed remedial scheme that explicitly or implicitly displaces the judge-made equitable remedy available under *Ex parte Young*.  In such cases, a plaintiff must rely on a statutory cause of action in order to bring suit."  *Id.*

Here, the RHA contains no such remedial scheme.  In fact, the Ninth Circuit—in concluding that the RHA does not create a private right of action— explicitly stated that the relevant section of the RHA "does not include any remedial language."  *Lil' Man in the Boat*, 5 F.4th at 960.  The Court thus concludes that Congress has not limited the presumptive equitable remedy available under the RHA.  As such, the Court DENIES the Motion to Dismiss as to the RHA.

Lastly, Defendants move to dismiss the claims against those Defendants named as officials as redundant because "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."   ECF No. 53 at 31 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).  Defendants also move to dismiss the Registration Fee and Notice Requirements claims against the County Defendants.  *Id.*  CLIA opposes both positions, arguing that it is not improper to name individual defendants in their official capacities, and that the Defendants associated with the counties are proper because they maintain some authority to enforce the Registration Fee and Notice Requirements.  *See* ECF No. 56 at 31.  The Court agrees with CLIA's first argument but not its second.

51

Although it's true that courts sometimes dismiss defendants named in their official capacities as redundant of the entity defendant, *see, e.g.*, *Park v. City & Cnty. of Honolulu*, 292 F. Supp. 3d 1080, 1090 (D. Haw. 2018), the Court is unaware of any requirement that it *must* do so. Further, while "[a] suit against a governmental officer in his official capacity is *equivalent* to a suit against the governmental entity itself," *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (emphasis added), and is *treated* as such, the plaintiffs may still properly bring official capacity suits "against persons who would be responsible for implementing any injunctive relief," *see R.W. v. Columbia Basin Coll.,* 77 F.4th 1214, 1222–23 (9th Cir. 2023). The Court thus declines to dismiss the claims against those Defendants named in their official capacities.

On the other hand, CLIA has not established that the County Defendants have anything to do with the Registration Fee or Notice Requirements. CLIA misleadingly argues that under HRS § 237D-2.5(a), the Counties are vested with "all the rights and powers of the director of taxation." ECF No. 56 at 31. But as Defendants point out, the first clause in the quoted sentence is critical: "*With respect to the county transient accommodations tax*, the applicable county director of finance shall have all the rights and powers of the director of taxation provided under this chapter." HRS § 237D-2.5(a) (emphasis added). Because the plain language of the statute limits the county officials' authority to matters concerning

52

the County Surcharges, and because the Registration Fee and Notice Requirements are unrelated to the County Surcharges, the Court DISMISSES CLIA's claims against the County Defendants as to the Registration Fee and Notice Requirements.

## C.    Preliminary Injunction

The Court now turns to Private PI Motion and the Federal PI Motion. Regarding the former, it need only consider CLIA's Registration Fee and Notice Requirement claims, having dismissed their other claims. The Federal Government challenges only the Registration Fee and State Tax and County Surcharges, and not the Notice Requirements.

### 1.    Legal Standard

Rule 65(a) allows courts to issue preliminary injunctions. Fed. R. Civ. P. 65(a). The purpose of a preliminary injunction is to "preserve the status quo and the rights of the parties until a final judgment issues in the cause." *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).

To obtain preliminary injunctive relief, a plaintiff must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Ninth Circuit employs a "sliding scale" approach to preliminary injunctions, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The issuance of a preliminary injunction may be appropriate when there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief"; it is "never awarded as of right." *Winter*, 555 U.S. at 22, 24 (citations omitted). "[C]ourts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,'" and should be particularly mindful, in exercising their sound discretion, of the "public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (citations omitted).

## 2.    Analysis

On the merits, the Court recognizes there are serious questions as to whether Act 96's State Tax, County Surcharges, and Registration Fee violate the Tonnage Clause or are preempted by the RHA, but it cannot conclude that CLIA and the

Federal Government are likely to succeed.[10]  And since CLIA's First Amendment claim—tied to the Notice Requirements—is based on the underlying constitutionality of Act 96's charges, CLIA has also failed to establish that it is likely to succeed on that claim.  As CLIA and the Federal Government have failed to establish a likelihood of success, and because they exclusively rely on alleged constitutional injuries, they have not demonstrated irreparable harm either.  By contrast, the equities here favor Defendants because enjoining Act 96's charges would severely disrupt Hawaii's tax administration and threaten its budget, which are "basic to the power of the State to exist," *Arkansas*, 520 U.S. at 826, whereas CLIA's members could eventually receive tax refunds if the Court (or another court) strikes down the law.  For the following reasons, the Court declines to award CLIA and the Federal Government the extraordinary interim relief they seek and thus DENIES the Private and Federal PI Motions.

---

[10]  While the Court concluded that CLIA plausibly alleged under Rule 12(b)(6) that the Registration Fee and Notice Requirements violate the Tonnage Clause or were preempted by the RHA, the likelihood of success standard requires a much stronger showing.  *See Tohono O'odham Nation v. U.S. Dept. of the Interior*, 138 F.4th 1189, 1202 (9th Cir. 2025) (citations omitted).

### a. *Likelihood of Success*

#### i. *Tonnage Clause*

The Federal Government contends that both the transient accommodations tax (State Tax and County Surcharges) and Registration Fee violate the Tonnage Clause, because when applied to cruise ships they constitute charges for the privilege of entering, trading in, and lying in Hawaii's ports. *See* ECF No. 97-1 at 12–15. Defendants respond that because Act 96 merely incorporates cruise lines into the generally applicable transient accommodations tax scheme, the taxes and fees are not impermissible charges for the privilege of using Hawaii's ports and are thus not unconstitutional. While the Court recognizes that the law is unsettled in this arena, it concludes that the generally applicable nature of the Registration Fee and State Tax and County Surcharges may remove those charges from the scope of the Tonnage Clause, or at least counsels in favor of finding that they are not impermissible charges. Further, even though the State Tax and County Surcharges may be calculated differently for cruise lines than for land-based short-term accommodations establishments, Plaintiffs have not clearly shown that such differences represent discriminatory treatment toward cruise ships. The Court thus concludes that Plaintiffs have not demonstrated a likelihood of success. The Court nevertheless acknowledges that there are serious questions going to the merits

56

precisely because the law about the Tonnage Clause isn't fully settled and how Act 96 will function in practice is unclear.

### 1.  Interpreting the Tonnage Clause

As noted above, the Tonnage Clause states simply that "[n]o State shall, without the Consent of Congress, lay any Duty of Tonnage."  U.S. Const. art. I, § 10, cl. 3.  At the founding, "Duty of Tonnage" was a term of art that referred to a variable duty based on "'the internal cubic capacity of a vessel,' *i.e.,* its tons of carrying capacity."  *Polar Tankers*, 557 U.S. at 6 (quoting *Clyde Mallory Lines*, 296 U.S. at 265).  Over time, as states tried to avoid the prohibition with workarounds, the Supreme Court interpreted the Tonnage Clause to forbid charges other than technical Duties of Tonnage.  Indeed, in 1849, the Supreme Court commented that the Tonnage Clause also prevented states from effectively charging a Duty of Tonnage "by merely changing the ratio [of the charge], and graduating it on the number of masts, or of mariners, the size and power of the steam-engine, or the number of passengers which she carries."  *Id.* (quoting *Passenger Cases*, 7 How. 283, 458–59 (1849)).  As such, by the 20th century and through today, the "prohibition against tonnage duties has been deemed to embrace all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, *which operate to impose a charge for the privilege of entering, trading in, or lying in a port*."  *Clyde Mallory Lines*, 296 U.S.

at 265–66 (emphasis added); *see Polar Tankers*, 557 U.S. at 9.  Still, while the

Tonnage Clause encompasses a broad range of charges on vessels, it does not

"operate[]as a ban on *any and all* taxes which fall on vessels that use a State's port,

harbor, or other waterways." *Polar Tankers*, 557 U.S. at 9.  For example, the

Tonnage Clause does not forbid "charges . . . for services rendered to and enjoyed

by the vessel." *Clyde Mallory Lines*, 296 U.S. at 265.  And, in general, it cannot

be read to give "vessels preferential treatment vis-à-vis all other property." *Polar

Tankers*, 557 U.S. at 9.

        As may be obvious from the Court's citation to cases from the 19th century

and the long gaps between Supreme Court cases, the Tonnage Clause isn't litigated

much.  *See Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port

Authority*, 567 F.3d 79, 81 (2d Cir. 2009) (commenting on the rarity of Tonnage

Clause challenges).  And even the sole 21st century Supreme Court case on the

matter reveals debate about the scope of the Tonnage Clause's prohibition.

*Compare Polar Tankers*, 557 U.S. at 4–11 (five-justice majority), *with id.* at 11–16

(plurality opinion), *id.* at 11–19 (Roberts, C.J. and Thomas, J., concurring in part

and concurring in the judgment), *and id.* at 19–20 (Alito, J., concurring in part and

concurring in the judgment).

        In *Polar Tankers*, the Supreme Court considered a City of Valdez personal

property tax ordinance that primarily targeted oil tankers.  557 U.S. at 5.  The

Valdez ordinance taxed vessels of at least 95 feet that regularly did business in the city and either took on at least a $1 million worth of cargo or engaged in other similarly valuable business. *See id.* While seven of the justices agreed that the Valdez tax violated the Tonnage Clause, the various opinions reflect a divide about the meaning of the clause. Those seven justices that concurred in the judgment all agreed that the Valdez tax was a classic duty of tonnage in that it specifically targeted ships and imposed charges based on their capacity. *See id.* at 9–10, 17. The disagreements arose over whether the Valdez tax would survive if the city taxed other property similarly.

Although the majority opinion said that the Tonnage Clause did not permit preferential treatment of ships, it did not explain when such a situation would arise. Further, in the plurality, four of the justices signed on to an interpretation of the Tonnage Clause that focuses on whether the challenged law taxes vessels "in the same manner" as other property. *Id.* at 11–12. Under that reading, if a law treats vessels similarly enough to other property, it complies with the Tonnage Clause. In *Polar Tankers*, the Valdez tax clearly didn't because it explicitly targeted ships and no other property. *See id.* at 9, 12–16.

But Chief Justice Roberts wrote a concurrence to rebut that interpretation of the clause, and the broader idea that the Tonnage Clause does not allow preferential treatment. In his estimation, which Justice Thomas agreed with,

whether a tax discriminates in favor of or against a vessel is beside the point if it acts as a "Duty of Tonnage." *See id.* at 17. He reasoned that the Tonnage Clause itself "says nothing about discrimination, and [so] it should hardly come as a surprise that a constitutional ban on tonnage duties would give preferential treatment to vessels. Such protection reflects the high value the Framers placed on the free flow of maritime commerce." *Id.* at 18.

Justice Alito appeared to split the difference between those two camps. He signed onto the majority opinion, which includes the line about not giving preferential treatment to vessels, but declined to join the plurality opinion that examined whether the Valdez tax was similar enough to other Alaska property taxes to survive the Tonnage Clause challenge. He also wrote a separate concurrence stating in full:

> I join the opinion of the Court, except for [the plurality portion], which might be read to suggest that the tax at issue here would be permitted under the Tonnage Clause if the tax were a property tax levied in the same manner on other personal property within the jurisdiction. It is sufficient for present purposes that the Valdez tax is not such a personal property tax and therefore, even if the Tonnage Clause permits a true, evenhanded property tax to be applied to vessels, the Valdez tax is an unconstitutional duty of tonnage.

*Id.* at 19–20.

Despite the lack of caselaw and the mixed ruling in *Polar Tankers*, some

precedent clearly arises from the Tonnage Clause cases.[11]  For example, it doesn't

matter that the Registration Fee is a one-time flat charge rather than a pro-rata tax

if it acts as a charge for entering the port.  *See Steamship Co. v. Portwardens*, 6

Wall. 31, 35 (1867).  Similarly, and as mentioned, that Act 96 effectively taxes

based on something other than the tonnage capacity of the vessels does not by

itself remove the tax from the ambit of the Tonnage Clause.  *See Passenger Cases*,

7 How. at 458–59.  Further, "where a tax otherwise qualifies as a duty of tonnage,

a general, revenue-raising purpose argues in favor of, not against, application of

the Clause." *Polar Tankers*, 557 U.S. at 10.  Still, the most recent Supreme Court

---

[11]  Additionally, the Court notes some conceptual ambiguity about the analytical
approach to Tonnage Clause challenges in *Polar Tankers*.  Certain portions of the
majority and plurality opinions consider whether the law at issue singled out ships
as compared to other forms of property.  But was this consideration to determine
whether the law was a Duty of Tonnage, as the majority opinion suggests?  Or was
that analysis done to determine whether the law was a *permissible* Duty of
Tonnage, as the plurality decision suggests?  Certainly, Chief Justice Roberts'
position is clear:  he points out that the Constitution forbids "*any* Duty of
Tonnage," and explained that he agreed that the Valdez tax was a Duty of Tonnage
because it operated as a charge for the privilege of entering the port.  The Chief
Justice, however, did not expand on how courts are to determine whether a charge
constitutes a Duty of Tonnage.  The Court need not resolve the question at this
stage, except to say that whether Act 96 singles out ships is relevant to the
constitutionality of the new law.  *See Polar Tankers*, 557 U.S. at 9–10 (explaining
that Valdez law applied exclusively to certain ships and not other forms of
property).

case warns courts against interpreting the Tonnage Clause to give ships preferential treatment.  *Id.* at 9.

## 2.  Application

The central question here—whether the extension of a generally applicable tax on short-term accommodations to cruise ships violates the Tonnage Clause— was never definitively answered in *Polar Tankers*.  Indeed, it was that question that Justice Alito said was unnecessary to address in that case.  Based on what has been presented at this stage and its own research, the Court determines that the answer to that question is "no."  The more difficult secondary question is whether the generally applicable transient accommodations tax nevertheless discriminates against cruise lines because of differences in how the tax is calculated for cruises vs. land-based accommodations.  On this latter question, CLIA and the Federal Government have failed to persuade the Court at this early stage that the differential treatment functions as per se discrimination.

The Federal Government argues that Act 96 imposes a duty that is prohibited by the Tonnage Clause because cruise ships will be unable to dock in Hawaii's ports without paying the Registration Fee or the State Tax and County Surcharges.  *See* ECF No. 97-1 at 13.  This, it says, is exactly the type of tax the Tonnage Clause bans, regardless of what the tax is called.  *See id.*  The Federal Government points to Act 96's tax calculation method—based on "gross rental

proceeds derived from cruise fares prorated by the percentage of days docked at any port in the State in comparison to the total number of days of the voyage"—as proof that the scheme is a tax for "lying in port." *Id*. at 13–14 (quoting Act 96 § 5.1).

The Federal Government further contends that the method of calculation for the State Tax and County Surcharges discriminates against cruise lines versus land-based establishments. *See id*. at 15. Specifically, Act 96 calculates the taxes for cruise lines based on "the total amount paid by a [passenger] for a cruise ship cabin on a cruise ship, inclusive of any mandatory fees imposed . . . for the use of shipboard services, facilities, meals, and onboard entertainment." Act 96 § 4.1. By contrast, for land-based transient accommodations, the State defines "gross rental" or "gross rental proceeds" to exclude "[c]harges for guest amenities, including meals, beverages, telephone calls, and laundry." *See* Haw. Admin. R. § 18-237D-1-03(c).

Defendants argue that the transient accommodation taxes and Registration Fee are not Duties of Tonnage because they are taxes on short-term accommodations rather than charges for the privilege of entering or lying in port. ECF No. 56 at 23–24. They emphasize that all such short-term accommodations are subject to the charges regardless of whether they're a hotel, rental apartment, or cruise ship, and that Act 96's fees do not apply to ships that do not offer short term

accommodations.  *See id.* 24; ECF No. 98 at 17.  In other words, the charges apply to all purveyors of short-term accommodations and Act 96 does not implicate the Tonnage Clause just because some of those purveyors happen to be ships.

Defendants also stress that the Registration Fee is a one-time payment that "does not depend at all on the number of entries or the duration of the vessel's stay in a Hawai'i port."  ECF No. 98 at 18.  They say that even though the State Tax and County Surcharges are prorated based on number of days in a port in the state as compared to the total days of the cruise, that does not make the charges a tax on the privilege of using the port because a ship could enter and leave a port multiple times in one day and still be subject to the same tax.  *See id.*  Further, Defendants assert that the prorating requirement is meant to reduce ships' taxes to charge only time spent in the state.  *See id.*  From all this, they argue that cruise lines are simply treated like other short-term accommodations businesses, with a few minor modifications to reflect the realities of ocean-based versus land-based accommodations.  Enjoining the tax, they say, would amount to giving cruise ships the preferential treatment *Polar Tankers* warned against, because cruise ships would offer transient accommodations in the state without paying the tax applicable to others.

The truth is that there is no federal caselaw that has rejected or upheld a tax on vessels that is similarly applied to other entities.  The closest case the Court

found is *State of Alaska v. North Pacific Fishing, Inc.*, 485 P.3d 1040 (Alaska 2021), in which the Alaska Supreme Court rejected a Tonnage Clause challenge to a law that extended taxes to certain types of fishing companies that had previously been excluded from the state's more general fisheries business tax.

In *North Pacific Fishing*, the plaintiffs were fishing companies that caught and processed fish in the Exclusive Economic Zone ("EEZ") off the coast of Alaska, but further out than the state's territorial waters. *Id.* at 1045. Because the plaintiffs did not process fish in Alaska, they were not subject to the state's fisheries business tax. *See id.* at 1046. Yet, Alaska imposed a "landing tax" on such processors that was "'substantially equivalent' to the taxes imposed on the rest of the fishing industry." *Id.* The plaintiffs challenged the landing tax under the Tonnage Clause, arguing that "its activities in Alaska consist of entering, trading in, or lying in a port, and that the landing tax must therefore fall unconstitutionally on its vessels for these activities." *See id.* at 1054–56 (internal quotation marks omitted). In rejecting the contention, the Alaska Supreme Court distinguished *Polar Tankers*, recognized that vessels and their owners should not receive preferential treatment, and concluded that the landing tax was a tax on the fish or the floating fisheries business as opposed to a charge for entering port. *See id.* at 1055–56 ("The landing tax is assessed on fish product first landed in Alaska

by floating fisheries businesses, not on the component business activity of
'entering and trading in' Alaska ports.").

There, as here, other vessels not involved in EEZ fish processing were not
subject to the tax, and land-based businesses involved in fish processing were
responsible for almost identical taxes.  *See id.* at 1056.  In other words, the Alaska
Supreme Court validated the landing tax because it was "designed and intended to
complement the fisheries business tax which is imposed on all entities processing
fish within Alaska, both on-shore and off-shore."  *Id.* at 1056 (internal quotation
marks, alteration, and footnotes omitted).

The Court acknowledges that *North Pacific Fishing* is non-binding, and that
its conclusion that the landing tax represents a charge on fish rather than the vessel
may be hard to reconcile with *Passenger Cases'* comment that states cannot avoid
the Tonnage Clause by changing the "ratio" of the charge.  Nevertheless, the Court
finds persuasive its conclusion that substantially similar taxes imposed on a type of
business—there, fisheries, here, short-term accommodations—do not necessarily
become Duties of Tonnage when they are imposed on a ship.  Otherwise, ships
could avoid taxes on business that their land-bound competitors pay, and so would
enjoy preferential treatment.  *Polar Tankers* instructs that the Tonnage Clause
cannot be read to that end.

66

Plaintiffs' precedent is not to the contrary because in every case Plaintiffs

cite, the challenged laws specifically targeted ships and no other forms of property

or business.  *See*, *e.g.*, *Steamship Co.*, 73 U.S. at 34–35 (striking down $5 fee that

Louisiana imposed "upon every ship entering the port of New Orleans, to be

collected upon every entry[.]").  For example, in *Clyde Mallory Lines*, the Supreme

Court considered a challenge to a $7.50 fee for vessels "500 tons and over" for

entering the harbor.  296 U.S. at 263.  In other words, the charge applied only to

ships and was explicitly tied to entry to the harbor.  Nevertheless, the Supreme

Court upheld the charge because it was for the policing of the harbor, i.e., a

"service[] rendered to and enjoyed by the vessel[s]."  *Id.* at 266–67.

*Polar Tankers* likewise represents an essentially paradigmatic Tonnage

Clause case.  There, the Valdez tax applied only to ships and no other personal

property.  *Polar Tankers*, 557 U.S. at 9.  And the value of the tax depended on the

ship's capacity.  *See id.* at 10.  As the Supreme Court explained, the case thus

"lie[d] at the heart of what the Tonnage Clause forbids" because the tax applied

almost exclusively to one class of ships and was tied to those ships' cargo capacity.

*See id.*

Based on that admittedly sparse caselaw, the Court concludes that the

general applicability of the transient accommodations tax scheme counsels against

a finding of likely unconstitutionality at this stage.  This is particularly true as to

67

the Registration Fee, which applies to all purveyors of short-term accommodations and is the identical $15 for all businesses that offer more than six units. HRS § 237d-4(a)(2). If perfectly evenhanded taxes don't run afoul of the Tonnage Clause, the Registration Fee is essentially a model for that.

As to the question of whether the State Tax and County Surcharges discriminate against cruise ships, Defendants offer little except to say the cruise lines would not be subject to taxes on food and other incidentals if the cruise lines separate out meal and other costs from the cruise fares because such non-accommodation charges would no longer be "mandatory fees" subject to the tax. *See* ECF No. 59 at 18 n.5. Suffice it to say, it remains an open question as to whether cruise ships can or would carve out meals or incidentals from their "mandatory fees."

In any event, at this early stage, the Court is unwilling to conclude that the differing methods of tax calculation constitute discrimination against the cruise lines. It's unclear whether the *Polar Tankers* plurality even stands for the premise that taxes on ships and other forms of property must be identical to pass muster under the Tonnage Clause. Certain portions of that opinion comment that the taxes must instead be "similar" or assessed in the "same manner" as those on other forms of property. *See Polar Tankers*, 557 U.S. at 12 (plurality opinion); *see also id.* at 17 (Roberts, C.J., concurring) ("The plurality goes on, however, to reject the city's

68

argument that the tax may be sustained as a property *tax similar to ones the city imposes on other property*." (emphasis added)).

Here, the Court views the method of tax calculation for cruise lines as at least similar to that for land-based accommodations and that any difference stems from distinctions between how those businesses typically charge.  Further, although a representative of one of CLIA's members submitted a declaration describing how cruise lines set rates and what expenses they have compared with land-based businesses, *see* ECF No. 79-1, it fails to definitively persuade the Court that cruise lines necessarily carry a heavier burden under the transient accommodation tax than any hotel in the state.  Indeed, if the Court were to enjoin Act 96 now, it would grant cruise lines significant preferential treatment over land-based businesses offering short-term accommodations—an outcome explicitly at odds with *Polar Tankers*.

The Court therefore concludes that Plaintiffs are unlikely to succeed on the merits of their Tonnage Clause claims, although this is an admittedly close call.  And it remains an open question as to how Act 96 will function—and how the cruise ships and state and counties will respond—once enacted.  Still, if the method by which the State calculates the tax does in fact discriminate against cruise lines as compared to, for example, hotels, then Plaintiffs may be able to prove a violation of the Tonnage Clause.

69

*ii.*    RHA

The Federal Government and CLIA also argue that they are likely to succeed on their claim that the RHA preempts Act 96 because it constitutes a tax, toll, or fee on ships in navigable waters. *See* ECF No. 97-1 at 17; ECF No. 28-1 at 17. Defendants respond that the RHA does not preempt Act 96 because its charges don't constitute tolls for ships simply passing through Hawai'i, but are instead related to the business of offering short-term accommodations rather than any "vessel-related function of the cruise ship." *See* ECF No. 98 at 21–22.

First, the Court notes a general presumption that Congress does not intend to preempt state law unless expressly stated, *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), and that the "the purpose of Congress is the ultimate touchstone in every pre-emption case," *id.* (internal quotation marks, alteration, and citation omitted). While the text of a statute is paramount to gleaning congressional purpose, legislative history often plays a role in the preemption calculus, *see New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995), especially when, as here, the text of the statute offers few clues as to its scope.

The relevant section of the RHA provides:

> No taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected from any vessel or other water craft, or from its passengers or crew, by any non-Federal interest, if the vessel or water craft is operating on any

> navigable waters subject to the authority of the United States, or
> under the right to freedom of navigation on those waters[.]

33 U.S.C. § 5(b)(2).[12]  The Federal Government and CLIA argue that the RHA

preempts Act 96 for the simple reasons that Hawaii's ports are navigable waters,

and Act 96's charges are fees that don't fit into the narrow exceptions of the RHA.

*See* ECF No. 97-1 at 17–18; ECF No. 28-1 at 17–18.  Yet, the broad reading of the

statute they implicitly propose would lead to absurd results and prevent any taxes

whatsoever (e.g., general business or sales taxes) on any boat that ever spent time

in one of Hawaii's ports.  Further, neither Plaintiff cites any cases for their

interpretation of the RHA.  The Court is unconvinced by their view of the RHA

and turns instead to caselaw for guidance.

As previously mentioned, courts have commented that § 5(b)(2) effectively

codifies the Commerce Clause and Tonnage Clause jurisprudence.  *Lil' Man in the*

*Boat*, 5 F.4th at 957.  And, like the Tonnage Clause, there is not much caselaw

interpreting the nuances of the RHA.  However, in those few cases where the

plaintiffs tried to challenge a broadly or generally applicable state tax as preempted

by the RHA, courts have rejected the attempts.

---

[12]  There are also several exceptions, but the State does not rely on any of them
here.

For example, in *North Pacific Fishing*, the Alaska Supreme Court concluded that the landing tax did not violate the RHA for the same reasons it survived the plaintiffs' Tonnage Clause challenge—namely, that § 5(b)'s prohibitory language restricts non-federal entities from "taxing vessels as vessels, or solely for their use of ports and navigable waters," but that the landing tax was a tax on the value of unprocessed fish. 485 P.3d at 1057. In other words, the landing tax was "not imposed on the vessels or their passengers or crew, *nor exacted specifically for the use of navigable waters*," but rather on the business the ship was engaged in. *Id.* (emphasis added).

Similarly, the ICA denied an RHA challenge to the State's general excise tax ("GET") from charter fishing tour companies. *See Reel Hooker Sportfishing, Inc. v. State, Dep't of Taxation*, 123 Hawai'i 494, 499–500, 236 P.3d 1230, 1235–36 (Haw. App. 2010). The fishing companies relied on the language of § 5(b) that no taxes or fees "shall be levied upon or collected from any vessel or from its passengers, by any non-federal interest, if the vessel is operating on any navigable waters of the United States" to argue that the RHA preempted the collection of the GET. *See id.* at 498, 236 P.3d at 1234 (internal quotation marks and alterations omitted). The court rejected the proposition, however, explaining that § 5(b) "refers only to *vessels* and their *passengers and crews,*" rather than "the business revenue or gross income generated by a business that operates the vessel." *Id.*

72

And even though the charters collected the GET from their passengers—like most businesses—that fact did "not change the nature of the GET from a tax on their businesses to a tax on their passengers." *Id.* at 499, 236 P.3d at 1235.

Both *Reel Hooker Sportfishing* and *North Pacific Fishing* also stressed the legislative history of the RHA in rejecting the respective challenges to the business taxes at issue. The cases cite the same statement from a member of congress that the RHA was intended to "addresses the current problem, and the potential for greater future problems, of local jurisdictions seeking to impose taxes and fees on vessels *merely transiting or making innocent passage through* navigable waters subject to the authority of the United States that are adjacent to the taxing community." *See id.* (emphasis added); *N. Pac. Fishing*, 485 P.3d at 1057 (both citing 148 Cong. Rec. E2143–04 (2002)); *see also Lil' Man in the Boat*, 5 F.4th at 961 (quoting same statement). Summarizing the caselaw and congressional intent, *North Pacific Fishing* concluded that courts should therefore consider "whether a tax challenged under § 5(b) discriminates against interstate commerce as well as whether it is imposed on vessels, passengers, or crews." 485 P.3d at 1057. The Alaska Supreme Court decided that interpreting § 5(b) to extend to charges imposed on activities involving vessels as opposed to the vessels themselves "would go beyond the statute's text, stated purpose, and the constitutional principles it expresses." *Id.*

73

Conversely, the Alaska Supreme Court struck down the state's wharf lease fee on a paddlewheel tour company that was based on the company's passenger count. *See State, Dep't of Natural Res. v. Alaska Riverways, Inc.*, 232 P.3d 1203, 1221 (Alaska 2010). The court held that because the lease charge was specifically tied to passenger count (at $0.25 per passenger), it constituted a "passenger fee" that was a "a charge exacted specifically for the use of navigable waters," and thus implicated the RHA. *See id.* While the court struck down the per passenger charge, it left in place the flat lease fee of $1000 per year. *See id.*

The Court finds persuasive the foregoing cases' discussions of the RHA, and especially *Reel Hooker Sportfishing* and *North Pacific Fishing*'s examination of when a tax constitutes a fee on a vessel or on its passengers. As such, the Court agrees that it should consider whether the Registration Fee and the State Tax and County Surcharges constitute charges specifically for the use of navigable waters, whether they are imposed on the vessels and/or passengers, and whether they are discriminatory. *See North Pacific Fishing*, 485 P.3d at 1057. If the Court were to interpret the RHA differently and, for example prohibit *any* tax that happened to fall on boats, it would again run afoul of *Polar Tanker*'s warning that the Tonnage Clause—which the RHA codifies—cannot provide a benefit to ships.

Act 96's charges operate much more like the business taxes at issue in *Reel Hooker Sportfishing* and *North Pacific Fishing* than the per passenger lease fee at

issue in *Alaska Riverways*.  The per passenger lease fee targeted one tour company for the use of one segment of river and was a flat fee per passenger.  *See Alaska Riverways*, 232 P.3d at 1221–22.  Here—just as the taxes in *Reel Hooker Sportfishing* and *North Pacific Fishing* were imposed on all business in Hawai'i and all fish processors in Alaska respectively—Act 96's charges apply to all purveyors of short-term accommodations regardless of their use of a harbor or navigable waters.  That cruise lines by their nature must use harbors does not by itself render any taxes they must pay into violations of the RHA.  *See N. Pac. Fishing*, 485 P.3d at 1058 (rejecting the plaintiffs' contention that the landing tax violates the RHA because "it applies only to activities involving vessels.").

Likewise, even if the State Tax and County Surcharges arguably charge based on the number of passengers, the same was also true in *Reel Hooker Sportfishing*.  In both instances, the tax is based on the income from the business offered to the passengers—a place to stay in the instant case and a fishing charter in the *Reel Hooker Sportfishing*—rather than an explicit charge for the passenger herself like the fee in *Alaska Riverways*.  More broadly, because of the generally applicable nature of the transient accommodations tax, the Court concludes that they are not charges specifically for the use of navigable waters that Congress was concerned about when it passed the RHA amendments.

That leaves the question of whether Act 96 discriminates against the cruise lines. As discussed above, the Registration Fee is an evenhanded tax on all businesses that offer short-term accommodations, and the Federal Government and CLIA have not established they are likely to succeed on their challenge to that charge. Similarly, for the reasons stated above, the Court finds that the method by which the State calculates the State Tax and County Surcharges for cruise lines is not clearly discriminatory at this early stage and thus does not necessarily conflict with the RHA.

### iii.    First Amendment

Because CLIA's First Amendment claim against the Notice Requirements is entirely derivative of its challenge to the validity of Act 96's charges, it has not established that it is likely to succeed on the claim for the reasons explained above.

### b.    Irreparable Harm

Although a determination that a plaintiff is likely to succeed on a constitutional claim usually means that the plaintiff has also satisfied the irreparable harm factor, *see Baird v. Bonta*, 81 F.4th 1036, 1044 (9th Cir. 2023), here the Court has concluded only that there are serious questions on the Tonnage Clause claims. And even if Plaintiffs have shown serious questions going to the merits, they must still demonstrate a *likelihood* of irreparable harm. *See Alliance for the Wild Rockies*, 632 F.3d at 1135 ("*Winter* tells us that plaintiffs may not

76

obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction."); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) ("In *Winter,* the Supreme Court definitively refuted our possibility of irreparable injury standard . . . [the] standard [instead] requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." (internal quotation marks and citation omitted)); *see also Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

Plaintiffs recognize that their irreparable harm argument largely depends on showing that Act 96 likely violates the Tonnage Clause and/or is preempted by the RHA.[13]  Indeed, the Federal Government relies almost exclusively on generalized statements that constitutional injuries are irreparable.  *See* ECF No. 97-1 at 24–25.

---

[13]  CLIA also argued that its members would suffer irreparable harm in the form of lost revenue from decreased demand for cruises, but that argument relates exclusively to their claims challenging the State Tax and County Surcharges rather than the Registration Fee or Notice Requirements claims.  *See* ECF No. 28-1 at 28–30.  As the Court dismissed CLIA's challenges to the State Tax and County Surcharges, the question of whether CLIA's members will suffer that form of claimed irreparable harm is not before it.  As to the one-time $15 Registration Fee, CLIA only asserts a constitutional injury as opposed to any irreparable effect on its members' businesses.

And CLIA likewise pegs its Notice Requirements claims to constitutional injury. Yet because the Court has concluded that Plaintiffs are not likely to prove such constitutional violations, they have not established they will suffer irreparable harm during the pendency of this case.

The Federal Government further suggests that it will suffer irreparable harm because Hawaii's passage of Act 96 might "embolden[]" other states "to impose similar unconstitutional restraints on federal law," that could "create a 'patchwork' system of laws, . . . undermining the uniformity of federal law." *See* ECF No. 97-1 at 25. That argument fails to persuade for a couple reasons. First, it again relies on establishing likelihood of success, which the Federal Government has failed to do. Second, the Federal Government has not shown that such "patchwork" system of state laws would develop before this case reaches final judgment, let alone that such temporary "undermining" of uniformity could not be undone.

### c.    *Balance of Equities/Public Interest*

In any event, the Court concludes that the balance of equities tips in favor of Defendants and that public interest weighs against preliminary injunctive relief.

If the Court preliminarily enjoined the law, but Act 96 was eventually upheld, Hawaiʻi and its counties would have lost potentially millions of dollars in valid tax revenue. As the Tax Injunction Act and comity caselaw warn, federal courts must be wary of "interfer[ing] with so important a local concern as the

collection of taxes." *Rosewell*, 450 U.S. at 522 (citation omitted); *see Levin*, 560 U.S. at 421–22 (explaining that "the modes adopted to enforce the [state] taxes levied should be interfered with as little as possible." (internal quotation marks and citation)); *see also Perez v. Ledesma*, 401 U.S. 82, 128 n.17 (1971) (Brennan, J., concurring in part and dissenting in part) (describing taxes as the "lifeblood of government," and noting that "[t]he special reasons justifying the policy of federal non-interference with state tax collection are obvious." (citations omitted)).

As to CLIA and the Federal Government, while constitutional deprivations constitute irreparable harm, the Court has concluded that Plaintiffs have not demonstrated they are likely to succeed on those grounds.  Further, even if Act 96 is ultimately struck down, the cruise lines would be able to recoup any State Tax and County Surcharges paid through the State's mechanisms, thereby reducing the tangible aspect of any harm they face.

The Court in its discretion thus concludes that a preliminary injunction should not issue.

### III.   CONCLUSION

For the foregoing reasons the Court GRANTS IN PART AND DENIES IN PART the Motion to Dismiss as follows:

(1) GRANTS the Motion to Dismiss as to all the Local Business Plaintiffs' claims without prejudice but without leave to amend;

(2) GRANTS the Motion to Dismiss as to CLIA's claims related to the State Tax and County Surcharges without prejudice but without leave to amend;

(3) GRANTS the Motion to Dismiss as to CLIA's claims related to the Registration Fee and Notice Requirements against the County Defendants with prejudice;

(4) DENIES the Motion to Dismiss with regard to CLIA's claims related to the Registration Fee and Notification Requirements asserted against the State Defendants.  *See* ECF No. 53.

The Court DENIES the Private and Federal PI Motions.  *See* ECF Nos. 28, 97.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, December 23, 2025.



Jill A. Otake
United States District Judge

CIV. NO. 25-00367 JAO-KJM, *Cruise Lines Int'l Ass'n, Inc., et al. v. Suganuma, et al.*; ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' JOINT MOTION TO DISMISS (ECF NO. 53); (2) DENYING PRIVATE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 28); AND (3) DENYING THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 97)